CHARLES A. MEREDITH, Appellant, v. RILEY T. BROCK ET AL.—17 S. W. (2d) 345.

Division One, May 18, 1929.

*S. Mayner Wallace* for appellant.

*Taylor R. Young* and *Frank X. Hiemenz* for respondents.

SEDDON, C.—Plaintiff (appellant) commenced this action in equity on December 7, 1925, in the Circuit Court of the City of St. Louis against Riley T. Brock, Emil E. Henner, Herman Heidland, John E. Roberts, and Fred Schumm, as defendants, seeking a decree for the specific performance of an alleged written contract for the conveyance of certain described real property situate in the city of St. Louis. The trial resulted in a decree and judgment, wherein the trial chancellor found the issues in favor of the defendants and that plaintiff is not entitled to the relief prayed in his bill, and wherein it was considered, adjudged, and decreed that plaintiff take nothing by his suit; that plaintiff's bill be dismissed; and that the defendants go hence without day and recover of plaintiff the costs of suit. After due procedural steps taken by plaintiff, he was allowed an appeal to this court from the decree and judgment so entered in the circuit court.

The substantive averments of the amended bill, or petition, upon which the cause was tried and submitted are as follows:

"Plaintiff for his cause of action states that at and prior to the 29th day of October, 1925, defendants as co-partners in a particular enterprise were the owners of a certain option contract held by them, whereby certain owners of a certain piece of property, hereinafter to be more specifically described, agreed to convey to said defendants said certain parcels or pieces of ground, located in the city of St. Louis and State of Missouri, and described as follows: [Here follows description.]

"That said parcels of ground as described herein were, upon the fulfillment of certain conditions, mentioned in the option contract held by defendants, to be conveyed to John E. Roberts for the use and benefit of all of the defendants herein and in furtherance of their partnership business of acquiring for the purpose of profit the afore-mentioned ground.

"That on or about the 29th day of October, 1925, defendants, through defendant Brock, defendant Henner and defendant Heidland, acting for and in behalf of all of the defendants, entered into a contract in writing with plaintiff whereby defendants agreed to convey to plaintiff the above-described property in consideration of the sum of twenty-six thousand dollars ($26,000); that said contract was in words and figures as follows, to-wit: [Here follows copy of alleged contract.]

"That said contract was signed by Riley T. Brock for all parties herein and delivered to plaintiff, but thereafter obtained from plaintiff by defendants, upon the representation made by defendants that said contract was desired for exhibition only to defendant Roberts, and upon the promise to return the same to plaintiff promptly, and said contract is not filed herewith because it is now and has been since that date in the possession of defendants.

"That plaintiff thereupon gave to defendants, and defendants received and accepted from plaintiff, his check, drawn on the Mercantile Trust Company of the city of St. Louis and State of Missouri, for five hundred dollars ($500) as earnest money and part payment on account of the above-mentioned and described piece ᴐf real estate.

"Plaintiff further states that thereafter, and on the 6th day of November, 1925, defendants became the absolute owners of the real estate afore-mentioned by deeds of conveyance executed to John E. Roberts for and in behalf of all of the defendants, and that said deeds of conveyance were duly filed of record in the office of the Recorder of Deeds of the city of St. Louis and State of Missouri, on November 10, 1925.

"Plaintiff further states that on the 28th day of November, 1925, being the date upon which the sale heretofore described in the con-

tract entered into between plaintiff and defendants was to have been consummated and upon which date deed was to have been delivered to plaintiff and upon which date plaintiff was to pay to defendants the purchase price of said property; that although plaintiff was ready and willing to perform all of the covenants required by him to be performed by said contract, defendants failed and refused to make and deliver to plaintiff a deed to the afore-mentioned and described property, and still fail and refuse to make and deliver said deed to said property to plaintiff in consideration of the price agreed upon in the contract herein set forth.

"Plaintiff further states that the balance required by him to be paid to defendants on account of the purchase price of this property is twenty-five thousand five hundred dollars ($25,500), which said amount plaintiff herewith tenders to defendants."

The defendants Brock, Heidland and Henner answered jointly, upon their several oaths, denying generally all of the averments of the petition; and, further answering, the said defendants stated and averred that they and their co-defendant, Roberts, had been jointly interested in an option to purchase the real estate in controversy, but that said option to purchase said real estate had expired prior to the first day of September, 1925, since which date the said answering defendants have had no right, title or interest in said real estate. The answer of said defendants further avers that, although the defendant Brock did sign the said alleged contract of October 29, 1925, he "did not deliver it to the plaintiff, or to anyone that the defendants had reason to believe represented the plaintiff." The answer of said defendants specifically denies that the answering defendants, Henner and Heidland, and their co-defendant, Roberts, had executed any paper or writing wherein they agreed to convey said real estate to plaintiff, and pleads the Statute of Frauds as a defense to plaintiff's action. Other facts are averred in said answer, but we deem it unnecessary to recite those pleaded facts herein.

The defendant Roberts filed a separate answer, upon his oath, denying generally all of the averments of the petition, and averring that he never at any time had executed any contract or writing agreeing to convey to plaintiff the real estate in controversy, and that he did not authorize, in writing or in any other manner, any person to agree, for and in his behalf, to convey said real estate to plaintiff, and that, if the co-defendants, Brock, Henner and Heidland, had pretended to act for and in behalf of the defendant Roberts, the said co-defendants acted without authority from Roberts; and the answer of said defendant specifically denies that the co-defendants, Brock, Henner and Heidland, have any interest in said real estate, or that they had any interest therein since the expiration of the

option which the answering defendant and said co-defendants previously had to purchase said real estate.

The answer of defendant Schumm is a general denial. The replies to the joint answer of defendants Brock, Heidland, and Henner, and to the separate answer of defendant Roberts, are conventional general denials.

The evidence discloses that plaintiff is a physician; that the defendants Henner and Roberts were engaged in the real estate business, each upon his own account; that the defendant Heidland was the owner of a bakery; and that the defendant Brock was engaged in the insurance business, and occupied an office with one Breitenbach, a lawyer, and who was also engaged in the real estate and insurance business. The four defendants, Henner, Heidland, Brock and Roberts, appear to have been close and intimate friends, although none of them is shown by the evidence to have had any business relations with the others until June or July, 1924, when the four named defendants appear to have acquired options to purchase two contiguous tracts of suburban real estate situate in the city of St. Louis, aggregating twenty-five or twenty-six acres, from the respective owners of said two tracts of land. On July 2, 1924, the four named defendants signed and entered into the following written agreement:

"It is hereby agreed and stipulated between the following parties, as follows: Emil E. Henner, Herman Heidland, J. E. Roberts and R. T. Brock to buy a certain tract of land containing 25.60 acres and located on the south side of Bancroft Avenue about 125 feet west of Hampton Avenue for the agreed sum of twenty-one thousand ($21,000) dollars, payable as set forth in earnest money receipt; all the above mentioned parties have paid one hundred ($100) dollars each toward purchase of the land mentioned and have instructed Emil E. Henner, Agent, to make the necessary earnest money contract to purchase said land. After the land is secured all parties above mentioned will make efforts to sell the land and make a profit, and said profit when made is to be divided equally, share and share alike, in four parts, and paid over to each party of this contract."

It appears from the evidence that the options for the purchase of said land expired, or were about to expire, two or three times, and were renewed by the four named defendants from time to time upon payment of considerations aggregating approximately $2500, of which aggregate amount the sum of $1000 was borrowed from the Hodiamont Bank upon a promissory note signed by Heidland and Henner, and the sum of $1000 was borrowed (seemingly without the giving of any promissory note evidencing the same) from the defendant Schumm. However, on January 2, 1925, the five defend-

ants, Schumm, Heidland, Roberts, Brock and Henner, signed and entered into the following contract or agreement:

"Received of Mr. Fred Schumm the sum of $1000 as part purchase money of an undivided interest of, in and to a certain contract of purchase for the total sum of $22,000 of twenty-five and one-half acres of Sub-Division tract lying and being in the city of St. Louis, Mo., on the south side of Bancroft Avenue, 130 feet west of Hampton Avenue, by Herman Heidland, J. E. Roberts, R. T. Brock and Emil E. Henner, each having now an equal interest in the same. Said tract of land when acquired by the parties hereto to be resold and the net profits from such re-sale when made, after re-payment to said Fred Schumm out of such re-sale of the sum of $2250, to be divided into five equal parts and paid to the parties hereto as follows: one-fifth to Fred Schumm; one-fifth to Herman Heidland; one-fifth to J. E. Roberts; one-fifth to R. T. Brock; and one-fifth to Emil E. Henner. Said Fred Schumm in payment for said one-fifth interest as aforesaid shall upon demand of Herman Heidland pay the further sum of $1250 in full payment of the total consideration of $2250 by which he acquires said one-fifth interest in said contract of purchase and in the net profits realized from a re-sale of said property."

The balance, or $500, of the aggregate consideration of $2500 paid for the said options, and the several renewals thereof, was seemingly contributed in cash and shared equally by Heidland, Henner, Brock and Roberts. The defendant Roberts testified that the option to purchase the main or larger part of the entire tract of land (which seems to have covered approximately eighteen acres of the aggregate twenty-five acres) expired, without having been renewed, on or prior to September 15, 1925.

It further appears from the evidence that ineffectual efforts were made by Henner, Heidland, Brock and Roberts to sell the land in controversy during the years 1924 and 1925, but that no purchaser was found by either of them, and that some, if not all, of the four parties named had sought Breitenbach, a lawyer and business associate of Brock, to find and procure a purchaser for said real estate, it being understood that Breitenbach would be paid a commission of $500 for his services in the event that he found a purchaser who would buy the said land. In the summer of 1925, Breitenbach produced the plaintiff as a prospective purchaser of said land. The evidence tends to show that plaintiff had been a law client of Breitenbach and that Breitenbach had, on several occasions, transacted certain legal matters as the attorney of plaintiff. Plaintiff, according to his testimony, met and was introduced to Brock, and possibly to Henner, by Breitenbach at the latter's law office some time in the latter part of September or the first part of October, 1925. A few

days thereafter plaintiff met Roberts and Brock on the land in controversy, and plaintiff viewed the land in the company of Roberts and Brock. However, no definite understanding was reached between plaintiff and any of the defendants respecting a sale of the land, although there is some evidence that Heidland, Henner and Brock, and perhaps Breitenbach, from time to time, sought to maintain and to keep alive the interest of plaintiff as a prospective purchaser of the land. At any rate, the evidence discloses that plaintiff, Heidland, Henner, Brock and Breitenbach met by appointment at Breitenbach's law office on the afternoon of October 29, 1925. The defendant Roberts was not present at that meeting.

Respecting what occurred at that meeting, the plaintiff testified as follows: "We met at Mr. Breitenbach's office and Henner, Heidland and Brock came in. Mr. Brock said—we asked him where Mr. Roberts was, and he tapped me on the back and said, 'He will be over here in a few minutes.' We waited awhile and he (Roberts) didn't come, and Mr. Breitenbach says to the rest of them, 'What is your understanding? Do you have to have unanimous consent?' And they said, 'No. We have an agreement whenever three agree upon a price the fourth one would have to accept.' Then I spoke up and I says, 'Well, now, you tell us that the deed is in escrow in Mr. Roberts' name. What if Mr. Roberts don't sign it?' 'Well,' they says, 'we will send the papers back and have them made out direct to you; but that will take, I believe, a month, and you are in a hurry to get to your grading, and so it will be best to have Mr. Roberts to sign it.' Well, then, after they told us that three were necessary they started to draw up the contract. Mr. Henner gave the description, and we negotiated then, and I finally agreed to pay them all cash; they couldn't use the paper, the deeds of trust, on account they had divided equally between the four interested parties, and I finally told them that I would give them all cash, and we agreed upon the five hundred dollars earnest money. The contract then was written by Mr. Henner dictating the description of it (the land), and after it was drawn up, it was three copies of it passed around to different ones, and they compared it with the original description, and they said that was all right. Then Mr. Henner, who sat to my right, he got up and walked over to the desk, and he says, 'Well, I will sign it for us folks as agent.' Then I spoke up and says, 'Well, under the circumstances, wouldn't it be more practical,' I says, 'if you had all of you sign it?' They were telling us about Roberts, you know. Then they said they thought it would be best and have it signed in the order that they all signed their papers: Roberts first, Heidland second, Henner third, and Brock fourth. . . . Mr. Heidland spoke, 'Roberts lives up close to me, and we will meet at my place and have Mr. Roberts to come over and we will

fix up the papers and bring them over to your office tonight.' Mr. Brock spoke up and said, 'I have got an engagement for tonight and I can't be there.' Heidland and Henner says, 'Well, you can sign it now.' And so Mr. Breitenbach handed him over the papers. He (Brock) sat right down on a little desk right beside of his main desk and signed them and handed them back to Breitenbach and completed them; he (Brock) signed two of them, and at that time I left. It was around four o'clock, or a little after, and I had an engagement I was trying to keep.''

The deposition of plaintiff, taken prior to the trial of the action, was read in evidence by defendants as an admission of plaintiff against interest. Plaintiff therein testified: ''Q. Now, then, when you got there, you saw Mr. Breitenbach write three copies, two copies and one original, of these earnest money receipts? A. I did. Q. And you saw three copies after they had been prepared? A. Yes, sir; I did. Q. And you saw Brock sign the three copies, did you? A. I did. That is, I don't know that I seen him sign the last one. I left just about that time. He was sitting over at a little desk right beside Breitenbach, and I don't know whether it is a typewriter desk, or something, and he was sitting there and he signed one or two of them—two of them, anyhow—and he handed them back to Breitenbach, and he blotted them, and I left then, and they were to go to Heidland's. Q. Now, then, did they ever deliver to you any one of those copies? I mean, did you have them in your hand? A. In my hand? Q. Yes. A. I don't think I did after they were signed. Q. You mean, after Brock signed them? A. After Brock signed them. Q. You do not pretend that Henner or Heidland signed them, do you, those three papers? A. No; they said they did not. Q. Well, you never saw any paper that they did sign, did you? A. No. I remember of Henner getting up and stating that he would sign for—Q. I know, but he did not sign? Nobody signed except Brock? A. Yes, sir. Q. And you saw Brock give these papers back to Mr. Breitenbach? A. Yes, sir; I don't know that he did the last one or not; that I couldn't say; just at that time is when I left. It was very late and I was in a hurry to go. Q. Now, arrangements were made, were they not, doctor, that evening, just as Mr. Breitenbach said, for Henner, Heidland and Roberts to meet at Heidland's bakery that evening to sign? A. Yes, sir. Q. Now, please tell us what you said about that, if anything? A. What I said about that meeting there to sign it? . . . Q. No; my question is, what did you say, if anything, about these three gentlemen meeting at Heidland's place to sign, if you said anything? A. Why, I presume that I sanctioned it all right, to sign them, to bring them over to me that night. Q. That was agreeable to you? You said so, did you? A. Yes, sir. Q. And you had

insisted that all four sign? A. I did, from a practial matter. . . . Q. What did you say, if you said anything, about the four signing these papers? A. I did say that it might—when Mr. Henner got up to sign, I said it might be practial for them all to sign. Q. You said it might be practical for them all to sign? A. All to sign. Q. Did you say any more about it than that? A. I don't remember of anything else that I said. Q. Now, after you had made that statement, was the arrangement made for these three gentlemen to meet out at Heidland's office that night to sign that paper, that is, this earnest money receipt which Mr. Breitenbach had drawn up? A. They said they would meet there. . . . Q. And that satisfied you and you went away? A. Yes, sir; they would bring the papers back to me at my home that evening.''

The witness, Breitenbach, testified respecting what occurred at the meeting of October 29, 1925: ''Q. Mr. Breitenbach, after you received the contract concerning which I am asking you, what did you do with it? A. I handed it either to Mr. Brock or to Mr. Heidland, and they took it away; I haven't seen it since. . . . Mr. Henner told me to draw up the contract, that is, this paper that is in evidence. Mr. Heidland told me to draw up the contract. Mr. Brock told me to draw up the contract. Dr. Meredith told me to draw up the contract. And I drew it up; and Mr. Henner dictated the description, and Mr. Henner said he was satisfied to sell the property to Dr. Meredith for twenty-six thousand dollars; Mr. Brock said he was satisfied to sell the property to Dr. Meredith for twenty-six thousand dollars; Mr. Heidland said that he was satisfied to sell it for twenty-six thousand dollars. . . . These gentlemen, Mr. Henner and Mr. Heidland, each told Mr. Brock to sign this agreement. At first, Mr. Henner, I think it was, suggested that he sign the paper as agent for himself, Mr. Brock, Mr. Heidland and Mr. Roberts. And after that Dr. Meredith suggested, said that it probably would be better if each of them, including Mr. Roberts, would sign. Mr. Heidland then stated, 'We will go and meet at my home this evening and Mr. Roberts will be there and we will all four sign, and after it is signed we will go over to the doctor and have him sign and that would, of course, finish up the matter.' Then Mr. Brock said that he had a previous engagement, he could not be free that evening, and then Mr. Henner and Mr. Heidland both said, 'Well, Brock, you sign up here, then you won't have to go over to Heidland's house, and Mr. Brock sat down and signed each of three copies, and I took—turned them over to me. I took them, looked them over and then turned them back to Mr. Heidland or Mr. Brock, I don't remember which one of the two. . . . Q. What was said, if anything? A. Well, Mr. Brock didn't say anything; after he signed he handed me the papers; I had them in my hand; he was

sitting right next to my desk when he signed them and I took them—Dr. Meredith, just about that time, had gone away, left the office; I think Mr. Brock had signed one of them when the Doctor left and I had them. Q. Then what did you do with them? A. Looked at them, and I handed them either to Mr. H[e]idland or to Mr. Brock. Q. Now, why was that done? A. Well, they said they wanted to take the papers out to Mr. Heidland's home and have Mr. Roberts there to sign them as they had previously agreed. Q. Then what did you do with the papers? A. I turned them over to, I think it was, Mr. Heidland. Q. All of the copies of the paper in question? A. Yes, sir.''

The defendant Brock, speaking of the meeting on October 29, 1925, testified: ''I stated to them that I would like to sign this contract as I was very busy and I was throwing every ounce of energy I had in my office and I didn't want to be bothered about running about to be signed at some time later when they might get together and decide to sign it, not feeling for a minute that I would bind—Q. I don't care what you felt; you said that? A. I said that. Q. Anything else said? A. Nothing else; the paper was handed me, and I signed it. Q. Was there anything else said about anybody else signing it? A. There was something said about Mr. Henner and Mr. Heidland and the Doctor (plaintiff) signing it. Q. What was said? A. They said they wouldn't sign till Mr. Roberts signed. Q. Who said it? A. Mr. Henner and Mr. Heidland said they wouldn't sign till Mr. Roberts signed it. Q. When they said that did Dr. Meredith say anything? A. I don't know that he did. Q. Did he object to it? A. He refused to sign it himself; he didn't sign it, at least. Q. Did he say anything about signing it—Dr. Meredith? A. Well, I don't know that he did; anyway, I don't remember that he did, or wouldn't or that he would.''

The written paper, drawn in triplicate by Breitenbach on October 29, 1925, was upon a printed form used in real estate transactions in the city of St. Louis, and is entitled: ''Receipt For Earnest Money.'' It reads as follows:

''St. Louis, Mo., October 29th, 1925.

''Received of C. A. Meredith the sum of five hundred dollars, as earnest money and part purchase money for a certain parcel of unimproved property, lying in the City of St. Louis, State of Missouri, described as follows: [here follows description of land] which property is this day sold to C. A. Meredith for the total sum of twenty-six thousand dollars, payable as follows: Twenty-six thousand dollars cash, including the above earnest and part purchase money. The title to said property to be perfect, and to be conveyed by Warranty Deed, free from liens and encumbrances, except the taxes for the year 1926, and thereafter, which the undersigned pur-

chaser assumes and agrees to pay; also subject to restrictions recorded. If upon examination the title be found imperfect, and cannot be perfected within a reasonable time, said purchaser is to be paid a reasonable cost of examining the title, and the earnest money is to be refunded. This sale under this contract to be closed on or before November 28, 1925, at the office of St. Louis Title Company, and if not closed by that time, owing to the failure or neglect of the purchaser to comply with the terms herein, the above-mentioned earnest money is to be forfeited to —————, but such forfeiture shall not release said purchaser herein from any liability for the fulfillment of this contract of sale, or the payments of money herein mentioned, if said seller shall elect to enforce fulfillment of the same. This sale under above terms and conditions is made subject to the approval of the owner of this property.''

The evidence shows, without dispute, that the paper writing was never signed by defendants Heidland, Henner, Roberts and Schumm. It does bear the signature of the defendant Brock. Both Henner and Heidland testified that they refused to sign the paper at the meeting held in Breitenbach's office on the afternoon of October 29, 1925. Henner testified: ''I said that the deed, everything, was made out in Mr. Roberts' name and he would sign it, absolutely; otherwise, there wouldn't be no sale.'' Henner also denied that he had said, at that meeting, that he had authority to sign, or could sign, the paper as agent for the other interested parties. Heidland testified: ''Mr. Brock signed the papers and then I said, 'I will take the papers and get Mr. Roberts to sign them; if Mr. Roberts signs them then I will sign them;' and Mr. Henner spoke up and says, 'If you all sign them then I will sign last.' '' Both Henner and Heidland testified that plaintiff was present in the meeting when the above-quoted statements were made.

On the morning of October 30, 1925, plaintiff called at Mr. Heidland's bakery and inquired of Heidland whether Roberts had signed the paper writing for the sale of the land in controversy. Being advised by Heidland that Roberts had not been found and had not signed the paper writing, plaintiff then handed to Heidland plaintiff's check for $500 (being the amount of the earnest money), dated October 30, 1925, drawn on the Mercantile Trust Company of St. Louis, and payable to the order of Emil E. Henner. Plaintiff testified that Heidland gave him a written receipt for the check, but that he (plaintiff) was unable to find the receipt and was unable to produce it at the trial; that he read over the receipt at the time, but did not pay much attention to its contents; and that it was an ''ordinary receipt.'' Heidland testified that he told plaintiff that he ''would take the check and give him [plaintiff] a temporary receipt for the check,'' and that plaintiff replied ''that would be all

right;" that Heidland thereupon wrote a receipt, which read, according to Heidland's recollection, in substance, as follows: "Received of Dr. C. A. Meredith five hundred dollars as part purchase money on a tract of land known as the Wilson tract, located between Bancroft Avenue and Devonshire Avenue, about 130 feet, more or less, west of Hampton Avenue. This contract shall not be binding unless signed by J. E. Roberts, E. E. Henner, R. T. Brock and H. Heidland. (Signed) H. Heidland;" and that plaintiff accepted the receipt and took it away with him. The testimony of the wife of Mr. Heidland tended to corroborate Heidland's testimony respecting the content or language of the receipt. She testified that her husband wrote the receipt with a fountain pen and handed it to her to read, before handing the receipt to plaintiff, and that, after her husband had signed the receipt, he handed it to plaintiff and said "that was just a temporary receipt until the other men would sign it; that was just to show he (plaintiff) had given this check."

There is some evidence that either Henner or Heidland subsequently offered to return the $500 check to plaintiff, but that plaintiff refused to accept the return of the check. The record discloses, however, that the check was tendered back to plaintiff on the trial of the cause, and that the tender thereof was refused by plaintiff's counsel. The evidence conclusively shows that the $500 check had not been cashed at the time of the trial.

There is no evidence in the record that plaintiff, at any time, made any legal tender to any of the defendants of the sum of $26,000, or any part thereof, which sum is the consideration stated in the paper writing of October 29, 1925, to be paid by plaintiff for the land in controversy. The petition avers that the balance required to be paid by plaintiff to defendants on account of the purchase price of the land in controversy is $25,500, "which said amount plaintiff herewith tenders to defendants," and plaintiff testified on the trial that he is ready, willing and able to consummate the purchase of the land, but no actual and legal tender of said sum, or any part thereof, is shown upon the record before us to have been made to either of the defendants, or to the court for their use and benefit.

The evidence further shows that on or about November 10, 1925, the defendant Roberts borrowed the sum of $26,000 from a personal friend, to secure the payment of which loan he executed and delivered a deed of trust upon and against the land in controversy in the expressed amount of $28,500. Out of the proceeds of the $26,000 loan thus obtained, Roberts paid the sum of $21,000, with some interest thereon, to the former owners of the land and obtained delivery of the deeds, which had been placed in escrow, conveying to defendant Roberts the fee simple title to the land. Roberts also paid and discharged the obligation of $1000 to the Hodiamont Bank, evidenced

by the promissory note of Henner and Heidland, and paid to Schumm the sum of $1000 which had been borrowed from Schumm to carry the options upon the land. The balance of the $26,000 loan obtained by Roberts, after payment of the above sums, was deposited by Roberts to his individual bank account.

The appellant assigns error in the entry, by the trial chancellor, of the decree and judgment *nisi,* dismissing plaintiff's bill or petition. Appellant insists that the evidence establishes the fact that the defendants were co-partners in the acquisition of the land in controversy, which was to be acquired and sold by the defendants, according to the written agreement made and entered into by all of the defendants, with the expectation of making a profit therefrom and sharing such profit equally, and hence the appellant contends that the act of defendant Brock, in signing the alleged contract, or receipt for purchase money, dated October 29, 1925, was the act of all of the several defendants, and bound each and all of the defendants, as co-partners, to convey the real property in controversy to the plaintiff, in accordance with the terms of the alleged written contract of October 29, 1925. The respondents, on the other hand, contend that the evidence is insufficient to establish that the defendants were co-partners in the said transaction, but that the evidence discloses that they were merely joint adventurers in a single transaction or enterprise; that their relation was akin to, or in the nature of, a tenancy in common, and that one tenant in common cannot bind his cotenants upon any contract for the sale and conveyance of real estate, unless authorized so to do in writing by each and all of his several cotenants, as prescribed by the Statute of Frauds (Sec. 2169, R. S. 1919). Much of the briefs of the respective parties, appellant and respondents, is devoted to a discussion and argument of the respective contentions and questions just stated. But interesting and debatable as those questions and contentions may be, we are of opinion that this appeal is determinable upon another and single question, the disposition and determination of which latter question makes unnecessary the determination of all other questions raised and presented by the respective parties herein. The single question, the determination of which, we think, disposes of this appeal, is whether the alleged written contract of October 29, 1925, was *delivered* by the several defendants, or any of them, on the one part, and *accepted* by the plaintiff, on the other part; for, unless there was a *delivery* of the alleged written contract of October 29, 1925, by, or on behalf of, the defendants; and unless there was an *acceptance* thereof by, or on behalf of, the plaintiff, it follows that there was no contract consummated, or made, by and between the parties, and consequently there is no completed and

binding contract which may be enforced, or ordered to be performed, in the present action.

It is well-settled law that one of the essential elements of a binding and enforcible written contract is a *delivery* of the written instrument evidencing such contract; and another, and correlative, essential element of an enforcible written contract is an *acceptance* of its delivery by the party to whom, or for whose benefit, such delivery is made. It is said in 13 Corpus Juris, 307, 308: "Of the execution of a contract in writing delivery is ordinarily an essential element; and a delivery on condition is not a complete delivery until the condition is fulfilled. . . . It is not necessary that a delivery be evidenced in any particular or prescribed manner, and it may be either actual or constructive, the question being one of intent. It would seem that whatever will be a sufficient delivery of a deed for the conveyance of land will be a sufficient delivery of any executory contract for the benefit of the party to whom delivery is to be made. The delivery is complete when the contract, being ready for delivery, is handed to the promisee with the intention at the time of passing the present title. . . . A delivery requires an acceptance with an intent to assume both the benefits and the burdens thereof."

The term "delivery" has been variously defined by the juristic authorities. One of the most satisfactory definitions of that term is found in Black v. Shreve, 13 N. J. Eq. 455, 461, wherein the term is held to mean, in legal phraseology, "the final absolute transfer to the grantee (or promisee) of a complete legal instrument sealed (or signed) by the grantor, covenantor, or obligor." And, in Western Union Telegraph Co. v. Locke, 107 Ind. 9, 13, the delivery of a document or written instrument is said to import "a surrender or parting with possession for a permanent purpose." Again, "delivery" has been described as a composite act; an act in which both parties must join and the minds of both parties must concur. [18 C. J. 478; Kinne v. Ford, 52 Barb. (N. Y.) 194, 197.]

Dr. Bishop, in his standard Commentaries on the Law of Contracts (2 Ed.), section 349, page 139, says: "Not only a specialty, but . . . every other written contract, must, to take effect, be delivered; and the delivery must be absolute, . . ." And the same learned text-writer thus defines the term "delivery" (Idem, sec. 350, p. 140): "The delivery of a written contract is any act whereby the party delivering it relinquishes his power over the writing, whether by passing it directly to the other party, or to any third person, or otherwise, with the expressed or implied intent that it shall operate as a contract; the other party, in fact, or in presumption of law, consenting thereto."

Our Code of Civil Procedure (Sec. 1415, R. S. 1919) provides: "When any petition or other pleading shall be founded upon any

instrument in writing, charged to have been executed by the other party and not alleged therein to be lost or destroyed, the execution of such instrument shall be adjudged confessed, unless the party charged to have executed the same deny the execution thereof, by answer or replication, verified by affidavit.'' Both the joint answer of the defendants Brock, Heidland and Henner, and the separate answer of the defendant Roberts, deny generally each and every allegation contained in plaintiff's petition, which alleges, *inter alia*, that the so-called contract of October 29, 1925, ''was signed by Riley T. Brock for all parties herein and delivered to plaintiff.'' The answers of the respective defendants furthermore contain the specific averment, or allegation, that none of the said answering defendants had executed any contract, paper, or writing, wherein they had agreed to convey to plaintiff the real estate in controversy. The answers are verified by the affidavits of the respective defendants, as provided by the statute, supra, and hence the answers of the several defendants joined issue on the question of the signing and delivery, or execution, of the alleged contract of October 29, 1925, which is the instrument upon which plaintiff's petition and cause of action is founded. In other words, the verified answers of the several defendants present the plea of *non est factum,* thereby adequately and sufficiently denying (under our Code of Civil Procedure) the signing and delivery, or execution, by Brock and his co-defendants, of the alleged contract which is the foundation of plaintiff's petition and cause of action. [Smith Co. v. Rembaugh, 21 Mo. App. 390; American Copying Co. v. Muleski, 138 Mo. App. 419; Hart v. Wire Co., 91 Mo. 414; Building & Loan Assn. v. Obert, 169 Mo. 507.] In view of the verified answers of the several defendants, which deny the signing and delivery (i. e., the execution), by Brock and his co-defendants, of the alleged contract of October 29, 1925, which instrument is the foundation of plaintiff's petition, the burden rested upon plaintiff to establish and prove, by a preponderance of the evidence, the execution (including the signing and delivery) of the alleged contract.

The testimony of plaintiff, himself, discloses quite clearly and certainly that no manual delivery of the written instrument, prepared and drawn in Breitenbach's office on October 29, 1925, was made to plaintiff at the meeting held on that date, or at any time thereafter, and that plaintiff has never had possession of said instrument, or of any of the three copies thereof. But plaintiff claims that Breitenbach was plaintiff's attorney and agent in the transaction, and that delivery of the written instrument evidencing the alleged contract of October 29, 1925, was made and accomplished when Brock, after signing the triplicate copies of the instrument, handed them to Breitenbach. The testimony of both plaintiff and Breitenbach in-

disputably shows, however, that plaintiff "insisted as a practical matter" upon the written instrument, and the several copies thereof, being signed by each and all of the four parties, Brock, Henner, Heidland and Roberts. Plaintiff testified that, when Henner suggested that he (Henner) would sign the instrument "as agent for us folks" (meaning, of course, as agent for Brock, Heidland, Roberts and Henner), plaintiff, himself, suggested that the instrument should be signed by all four parties; and plaintiff testified further that the persons who were present in the meeting of October 29, 1925. said "they thought it would be best to have it (the alleged contract) signed in the order they all signed their papers: Roberts first, Heidland second, Henner third, and Brock fourth." Thereupon, it was agreed by all of the parties present at Breitenbach's office on October 29, 1925, that the three copies of the written instrument evidencing the alleged contract were to be taken by Heidland to the latter's home, or place of business, for the purpose of obtaining Roberts' signature and assent to the instrument, and, when Roberts' signature and assent to the instrument had been procured, the instrument was then to be signed by Heidland, Henner and Brock. The evidence further shows that Brock, because of some other and conflicting engagement, found it inconvenient to meet at Heidland's home, and that Brock suggested, as a matter of personal convenience, that he sign the triplicate copies of the instrument while the parties were in Breitenbach's office, which Brock accordingly did. It is true that Breitenbach testified that, after Brock had signed the three copies of the instrument, Brock thereupon handed the several copies thereof to Breitenbach, who looked them over and then handed all three copies of the instrument over to Heidland or Brock; but Breitenbach, when asked why he handed the three copies of the instrument over to Heidland or Brock, answered, "They said they wanted to take the papers out to Mr. Heidland's home and have Mr. Roberts there to sign them *as they had previously agreed.*" The testimony of plaintiff, himself, refutes any intention on his part to accept a delivery of the written instrument before and until it had been signed by all four parties, namely. Roberts, Heidland, Henner and Brock; for, if it had been plaintiff's intention to accept a delivery of the instrument if, and when, signed by any one of the four parties as agent for all, plaintiff would have agreed to Henner's suggestion that Henner would sign "as agent for us folks." Plaintiff testified quite positively that he did not agree to Henner's suggestion, but, on the contrary, that he "sanctioned" the later understanding, or suggestion, that the four parties, Roberts, Henner, Brock and Heidland, should meet at Heidland's home, or place of business, to sign the instrument evidencing the alleged contract. Breitenbach's act in handing the three copies of the instrument over to

Heidland or Brock, after Brock had signed the same, was in pursuance of the understanding and agreement of all of the parties that the instrument was to be executed at Heidland's home by there procuring the signature and assent of Roberts thereto, and also the signatures of Henner and Heidland, and refutes any intention on the part of Breitenbach to accept a delivery of the instrument, as agent for and on behalf of the plaintiff, at the time the parties were in Breitenbach's office. Viewing the evidence, in its entirety, in the light most favorable to plaintiff, we think the evidence is wholly insufficient to establish the intention of the defendants to deliver to plaintiff, or to Breitenbach, as agent for the plaintiff, at the time of the meeting in Breitenbach's office, a complete legal instrument, or to establish the intention, either of plaintiff, or of Breitenbach, to accept, at that time and place, a delivery of a complete legal instrument. The evidence does not show, or tend to show, that the defendants relinquished their power and control over the instrument, after the instrument had been signed by Brock alone, with the intent that it should operate as a contract; nor does the evidence tend to show an intent on the part of plaintiff, or of Breitenbach, to accept the instrument with Brock's signature alone thereon as an operative contract. In other words, we think that plaintiff has failed to sustain the burden of establishing and proving the execution (including the signing and delivery) of the alleged contract of October 29, 1925, which is the foundation of plaintiff's petition and cause of action.

Other matters are assigned as error by the appellant, but such matters have no bearing upon the single question which is determinative of this appeal (namely, the question of delivery of the alleged contract), which question must be ruled against the appellant.

The decree and judgment *nisi* should be affirmed, and it is so ordered. *Lindsay* and *Ellison, CC.*, concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.