WESLEY C. KELLEY v. ILLINOIS CENTRAL RAILROAD COMPANY, Appellant.—No. 38672.—177 S. W. (2d) 435.

Division One, December 6, 1943.

Rehearing Denied, January 3, 1944.

Motion to Transfer to Banc Overruled, February 7, 1944.

*Watts & Gentry* for appellant; *John W. Freels* of counsel.

302

*Mark D. Eagleton* and *Roberts P. Elam* for respondent; *Asa J. Wilbourn* of counsel.

304

BRADLEY, C.—Action for personal injuries under the Federal Employers Liability Act. 45 U. S. C. A., Secs. 51-60. Verdict and judgment for plaintiff for $45,000, and defendant appealed.

Plaintiff was a member of a section crew, and on September 17, 1941, was working, along with another crew, a few miles south of Mounds, Illinois. About midafternoon, plaintiff's foreman, Bird, and

some of the men, went on a motorcar with trailer, from place where working, to Mounds. In a few minutes thereafter, another motorcar with trailer, remainder of the men, including plaintiff, in charge of foreman Dalton, followed the first motorcar. The first motorcar stopped at Mounds; Bird got off to see about some ballast, and the second motorcar upon which plaintiff was riding collided with the first motorcar, resulting in the injuries complained of. Negligence is conceded, and it is also conceded that the cause is under the Federal Employers Liability Act.

Error is assigned (1) on overruling the demurrer to the evidence; (2) on refusal to dismiss; (3) on the opening statement; (4) on argument of counsel; and (5) on an alleged excessive verdict.

The demurrer to the evidence is based on the contention that plaintiff executed a release. Plaintiff contends that the release was signed on condition, and that the condition was not met, and that the release, therefore, was never in effect.

To represent him in the matter of his cause against defendant, plaintiff employed Asa J. Wilbourn, an attorney of Cairo, Illinois, and Wilbourn associated Mark D. Eagleton, an attorney of St. Louis. The contract with the attorneys was executed January 30, 1942, and suit was filed February 3, 1942. Plaintiff was in the hospital at Cairo, for some time, and then was taken to his home near Cairo. Defendant's claim agent, L. L. Heilig, called on plaintiff at intervals and on October 27, 1942, plaintiff signed the release relied upon by defendant, which release recited a consideration of $3500. Upon signing the release, Heilig delivered to plaintiff a draft, drawn by Heilig for $3500, on defendant's treasurer in Chicago. Contemporaneously with the signing of the release and delivery of the draft, plaintiff signed a stipulation captioned with the style of the case, court where pending, etc. The stipulation recited:

"It is hereby stipulated and agreed by the plaintiff and the defendant in the above entitled cause that said suit be and the same is hereby dismissed with prejudice and at the cost of the defendant, said matter having been fully compromised, adjusted and settled."

And contemporaneously with the signing of the release, delivery of the draft, and the signing of the stipulation, Heilig addressed to and delivered to plaintiff a letter, stating: "This confirms our understanding and agreement today to the effect that since you have settled all claims on account of injuries sustained by you at Mounds, Illinois, in motorcar accident while you were employed as section laborer, on the 17th day of September, 1941, with the Illinois Central Railroad Company, satisfactorily and have dismissed your lawsuit now pending in the circuit court of the City of St. Louis, Missouri, the Illinois Central Railroad Company will pay such attorney's fees as you have agreed to pay to your attorney, Asa J. Wilbourn, of Cairo, Illinois, in connection with said claim and lawsuit upon presentation

by you to the Illinois Central Railroad Company of a certified copy of said employment contract.''

On the day the release and other papers were signed, Heilig, in his automobile, took plaintiff and his wife from their home near Cairo to the office of Dewey & Cummings, local attorneys for defendant at Cairo, and all the papers were signed in the private office of Mr. Cummings, who dictated the stipulation to dismiss. Concerning the release, etc., plaintiff, in the reply, alleged:

''That on or about the 27th day of October, 1942, the said Heilig visited the plaintiff at plaintiff's home for the purpose of attempting to effect a settlement of plaintiff's said claim and suit in the absence of plaintiff's attorneys of record and without their knowledge or consent, but the plaintiff, who is an illiterate and uneducated man, incapable of knowing the exact extent and nature of his legal rights, refused to deal with defendant unless at least one of his attorneys of record was present; that, upon learning of this fact, defendant, through Heilig, on the 27th day of October, 1942, tricked and induced plaintiff into going to the office of counsel for the defendant at Cairo, Illinois, by falsely representing to plaintiff that one of plaintiff's attorneys of record, Asa J. Wilbourn, of Cairo, Illinois, would come. to that office so that plaintiff's said attorney might know of the proposed settlement and approve it; that, relying upon said false representation, plaintiff did go to the office of defendant's said counsel at Cairo, Illinois; that while plaintiff was in said office on said occasion, the defendant produced the form of release referred to in defendant's answer herein, and various other papers, to be executed by plaintiff in connection with a proposed settlement of plaintiff's said claim and suit, and obtained plaintiff's signature to said release and other papers, and delivery thereon to defendant, *upon the condition* that said release and other papers would be of no force or effect unless plaintiff's said attorney of record, Asa J. Wilbourn, *approved* the aforesaid proposed settlement of plaintiff's said claim and suit; and that, upon the aforesaid conditional signing and delivery of said release and other papers by plaintiff, as aforesaid, defendant delivered to plaintiff a certain draft, payable to the order of plaintiff, in the sum of $3500.00, *upon condition* that if plaintiff's said attorney of record, Asa J. Wilbourn, did not approve the aforesaid proposed settlement of plaintiff's said claim and suit, said draft was to be of no force and effect'' (italics ours).

Plaintiff was reluctant to sign, in the absence of his attorney, and several hours elapsed after arriving at the office of Dewey & Cummings before he did sign. Concerning what occurred at the office of Dewey & Cummings, plaintiff testified:

''Q. Now, what did you do, if anything, with reference to asking for your lawyer after you got there? A. After we went up, we went in and I said, 'Where's Mr. Wilbourn?' He (Heilig) said, 'Mr. Wilbourn will be here in a little while', and I said, 'Well, that's

what we want; we want Mr. Wilbourn here'; and so I and the wife sat down, and he did too, and he said, 'Mr. Wilbourn will be here.' I said, 'Well, we're waiting on him; he will have to be here because I can't hardly read or write', and he said, 'Well,' he said, 'We'll wait a while on him.' Q. After you waited a while, what did he do then with reference to trying to get you to sign some papers? A. Well, he wanted me to sign the papers. I told him I wouldn't do it unless Mr. Wilbourn was there. Q. You told him that? A. Yes; and I got up to go to the phone (Heilig had stepped out of the room) and called Mr. Wilbourn. I called Mr. Wilbourn's office and I couldn't get him, so I called his residence. I got his wife and she said she guessed he was over at some other attorneys at law. Q. Did you repeat that to Heilig? A. Yes (Heilig returned before plaintiff sat down). Q. What did he say then? A. He said, 'Set down; I will tend to that end of the business; just set down and be quiet. . . . He told me to set down. Q. Now then, some time after that, did you sign some papers for Mr. Heilig? A. He told me, he said— Q. First, did you sign them? A. Yes. █ Q. And under what circumstances did you sign them? What did he say that induced you to sign them? A. He told me, he said, 'If it's approved by Mr. Wilbourn, why', he said, 'You go ahead and sign them.' He said, 'If it ain't, why it won't count nohow.' He said, 'You can tear up the papers and send back the draft.' Q. That is what Mr. Heilig said? A. Yes. Q. And was it on that condition that you signed? A. Yes. I was all worked up and nervous and hurting so I couldn't hardly see the papers myself; couldn't read them nohow. Wouldn't know one from the other, so far as that goes. . . . I was crying; I was hurting and paining all the time.''

The evidence of plaintiff's wife, who was at all times present, corroborates him as to the conditions upon which the release and other papers were signed. Mr. Cummings testified: ''Nothing was said in my hearing at any time about any condition concerning these papers or about submitting those papers to Mr. Kelley's attorney for his approval, and that if he did not approve of them the draft should be returned to Mr. Heilig, and the papers might be destroyed, torn up, and would not count for anything. I was out of the office where the parties were one other time. I was called out from my office into the outer office, and Mr. Heilig was in there at the time. The girl just called me out to ask something. I was out just long enough to walk out there and answer her question and walk back. I wasn't out long.'' Heilig denied that there was any such condition as claimed by plaintiff; said that the release was unconditional. On cross examination of Heilig, the following appears:

''Q. And you had already had instructions to go there (plaintiff's home), hadn't you? A. I had instructions if the occasion arose whereby Kelley indicated he wanted to settle his case direct, to go ahead and see what could be done and report it to my superior. Q.

And you had those instructions at least a week before you visited Kelley? A. Something like that; yes. Q. And you had instructions from your superior that if he wanted to settle the case direct, to see if you could do it? A. Yes, sir. Q. By the use of the term, 'direct', you, as a claim agent, understand, the same as I do, that meant with the exclusion of his lawyers? A. So far as the settlement itself was concerned. Q. Yes. A. Not speaking of the attorney's fees. Q. Yes. In other words, you had instructions a week in advance—at least a week in advance—that if you could make a direct settlement with Kelley at any time that was propitious, excluding his attorneys, so they wouldn't be present at the settlement, to go ahead and do it; is that right? A. Yes."

Next day, October 28, after these papers were signed, plaintiff's wife went to Cairo, saw Mr. Wilbourn, who on same day, went to see plaintiff. Wilbourn disapproved the settlement, and on October 29, he and plaintiff went to the office of Mr. Eagleton in St. Louis, and Mr. Eagleton, by registered mail, sent the release, etc. to defendant in Chicago. The matter was referred to defendant's general attorney in Chicago, and he returned the papers to Mr. Eagleton, who filed them in court and, according to his opening statement, such filing was made "in order to again tender the same (the release, etc.) to defendant in order that they may be used as exhibits in this case by either party."

The release follows: "For the sole consideration of thirty-five hundred dollars, $3500.00, to me paid in full satisfaction by the Illinois Central Railroad Company, I hereby release and forever discharge said Illinois Central Railroad Company and all of its employees from all claims, demands, and causes of action of any nature, kind, character or description, either at common law or under any state or federal statute, for damages either to me or my property, which I now have or may have against it or them, including all claims, conditions of health or injuries, whether now known or unknown or which may hereafter develop, arising out of injuries received by me at or near Mounds, State of Illinois, on or about the 17 day of September, 1941, by reason of riding on a section motorcar, while employed as section laborer, when the car derailed, or collision of motorcars occurred.

"The payment of said sum is the only consideration for this release, which contains ▆▆▆ the entire understanding. No contract or promise of employment is made with me.

"I further represent that I am of lawful age and that before signing and sealing this release I have fully informed myself of its contents. I have read this release and understand it."

▆▆ Defendant contends that plaintiff is bound by the release; that the alleged "fraudulent representations (condition that Wilbourn approve) which he says were made and which induced him to sign

the release, can be of no avail because the alleged fraudulent misrepresentations did not refer to facts then existing or which had existed, but related to an alleged promise to do something in the future." Defendant cites Field v. National City Bank et al., 343 Mo. 419, 121 S. W. (2d) 769; Jeck v. O'Meara et al., 341 Mo. 419, 107 S. W. (2d) 782; Patzman v. Howey, 340 Mo. 11, 100 S. W. (2d) 851; Reed v. Cook et al., 331 Mo. 507, 55 S. W. (2d) 275; Grand Lodge, etc. v. Mass. Bonding & Ins. Co., 324 Mo. 938, 25 S. W. (2d) 783; Metropolitan Paving Co. v. Brown-Crummer Inv. Co. et al., 309 Mo. 638, 274 S. W. 815; Bryan v. L. & N. R. Co., 292 Mo. 535, 238 S. W. 484; Edwards v. French et al., 304 Mo. 194, 263 S. W. 132; Younger v. Hoge et al., 211 Mo. 444, 111 S. W. 20.

On the other hand, plaintiff contends that the release was upon the condition that it "be approved by his attorney, Asa J. Wilbourn, and the proposed settlement having been disapproved by Mr. Wilbourn, the release never became effective." Plaintiff, among other cases, cites Meredith v. Brock et al., 322 Mo. 869, 17 S. W. (2d) 345; Ware v. Allen, 128 U. S. 590, 9 S. Ct. 174, 32 L. Ed. 563; Burke v. Dulaney, 153 U. S. 228, 14 S. Ct. 816, 38 L. Ed. 698; National City Bank v. Louisville Trust Co., 67 Fed. (2d) 97; American Surety Co. v. Egan et al., 62 Fed. (2d) 223; Mankin v. Bartley, 277 Fed. 960; Jordan v. Davis et al., 108 Ill. 336; Kilcoin v. Ortell et al., 302 Ill. 531, 135 N. E. 16; Handley v. Drum et al., 237 Ill. App. 587; Halloran v. Fischer, 126 Conn. 44, 9 Atl. 290.

The cases cited by defendant deal with the general rule that a fraudulent representation, in order to support a cause of action or defense, must relate to present or pre-existent facts, and not to the future. Such rule is conceded, but such is not the situation here, according to the evidence of plaintiff and his wife, and since the verdict was for plaintiff, we take his version as to the facts. Plaintiff's case is based on the proposition that no release was ever *effectively executed* and this because his attorney did not approve the settlement. "It is well settled law that one of the essential elements of a binding and enforceable written contract is a delivery of the written instrument evidencing such contract; and another, and correlative, essential element of an enforceable written contract is an acceptance of its delivery by the party to whom, or for whose benefit, such delivery is made. It is said in 13 C. J. 307, 308: 'Of the execution of a contract in writing delivery is ordinarily an essential element; and a delivery on condition is not a complete delivery until the condition is fulfilled.' " Meredith v. Brock et al., 322 Mo. 869, 17 S. W. (2d) 345, l. c. 351.

Ware v. Allen, 128 U. S. 590, 9 S. Ct. 174, 32 L. Ed. 563, was an action on a promissory note. The defense was that at the time of signing and delivery the makers were to have "an opportunity to consult counsel upon whom they relied, as to the validity of the trans-

action, and if such advice was adverse, then the instrument given by them was to be of no effect." In ruling the point the court said:

"We are of opinion that this evidence shows that the contract upon which this suit is brought never went into effect; that the condition upon which it was to become operative never occurred, and that it is not a question of contradicting or varying a written instrument by parol testimony, but that it is one of that class of cases, well recognized in the law, by which an instrument, whether delivered to a third person as an escrow or to the obligee in it, is made to depend, as to its going into operation, upon events to occur or be ascertained thereafter." The rulings in the other cases cited by plaintiff are to the same effect, and it is not necessary to review them separately.

Counsel for defendant, in the brief, concede that the Ware case [128 U. S. 590] and the Burke case [153 U. S. 228] "appear to support, to some extent, the claim made by the respondent." Counsel point out that the release here involved contains the statement that "the payment of said sum (the $3500) is the only consideration for this release which contains the entire understanding." And counsel say that in view of that provision "all collateral agreements of every kind and character are necessarily excluded." But, according to the reasoning in the cases relied upon by plaintiff, the condition upon which plaintiff signed was not something that merged in a *completed* contract, but operated to postpone the *effectiveness* of the release until Mr. Wilbourn approved, and since he did not approve, the release never became effective. We think defendant's demurrer to the evidence was properly overruled.

Near the close of plaintiff's evidence defendant orally moved to dismiss as follows: "Mr. Gentry: If the court please, it now appearing from the testimony of the plaintiff himself that the stipulation to dismiss this case was signed by him and by an agent of the Illinois Central Railroad Company, and appearing also from the statement of counsel that that statement has been filed by him in this court, I now, on behalf of the defendant, move the court to act upon that stipulation and dismiss the cause." Manifestly, apart from the release, there is no merit to the motion, and we have ruled that the issue on the release was for the jury. The motion to dismiss was properly overruled.

 The opening statement. After the jury was selected and sworn, counsel for plaintiff began his opening statement. Thereupon, defendant's counsel made this objection: "Now, if your Honor please, I object to counsel making any additional statement for the reason that he very fully covered the case, as the reporter's notes will show, when he went to impanel the jury. He went over the entire case and stated the facts he expected to show them, both as to the original accident and the settlement of this case, and for him now to be permitted to go and repeat any or all of that same matter again would

be unfair to the defendant, stating twice the facts that he expects to prove." The objection was overruled and exception saved. What occurred while qualifying the jury is not in the record, and defendant's objection will not prove itself, hence no point is presented. Mickel v. Thompson, 348 Mo. 991, 156 S. W. (2d) 721, l. c. 725, and cases there cited.

During the opening statement the following occurred: Mr. Eagleton: "Well, shortly after he (plaintiff) engaged counsel, the claim agent then began paying visits to the man's home. As a matter of fact, I think the evidence will show that once attorneys are engaged in a case, that under the rules of the supreme court of Missouri, and under the rules that govern lawyers' conduct throughout the whole United States—Mr. Gentry: Wait a minute; I object to any statement on that subject. I see what he is coming to because it is in his reply. It is certainly not a proper matter to be inquired into in this case—as to what is provided by the provisions of the American Bar Association or anything of that sort. That is not a matter to inquire into in this case and it is improper to state it. I object to counsel stating that, as he is starting to. The Court: Overruled. Mr. Gentry: Note our exception. Mr. Eagleton: What I proposed to say was that they knew, as attorneys, that they had no right under the rules of the Bar Association—American Bar Association—that govern lawyers throughout the United States, and the rules of the supreme court of Missouri, to go at any time direct to the client and attempt to negotiate with him a settlement. Mr. Gentry: Now, I object to that statement, if your Honor please, and move the court to tell the jury to disregard it, and I ask that it be stricken from the record, for the reasons I have stated. The Court: It's overruled. Mr. Gentry: Note our exception. Mr. Eagleton: And for the reason I think the evidence will show you gentlemen—we expect to show you that for that reason that an attorney who would do that would be subject to discipline; that they had a man who is not an attorney, Heilig, who is not admitted to the Bar—they had him go out to see this man, because not being a member of the Bar he could go ahead and do the job, so they thought, without being disciplined, that is to say, without being thrown out of the Bar Association or something of that kind. Mr. Gentry: Same objection. I made the same objection to all those statements that I previously made. The Court: Overruled. Mr. Gentry: Exception."

The alleged prejudicial statements amount to no more than that defendant knew that plaintiff had an attorney and that, notwithstanding such knowledge, defendant sought to settle the case without the knowledge of his attorney; that such conduct on the part of an attorney is a breach of professional ethics which defendant knew, but that defendant sent Heilig, who was not an attorney, to "go ahead and do the job." And such is about what Heilig frankly ad-

mitted in his evidence, as appears, supra. We do not think that error was committed in overruling defendant's objections to the complained of statements, supra. Thompson v. St. Louis Southwestern Ry. Co. (Mo. Sup.), 183 S. W. 631, l. c. 636.

Here is an appropriate place to say that neither Mr. Gentry nor any one connected with his firm, had anything to do with making the settlement.

■ Defendant further complains on remarks made in the opening statement. Mr. Eagleton: "This Heilig, he had a woman by the name of Artz. I think she is in the courtroom, too. She is the wife of another employee who had been injured, and Artz was in the same hospital room with Mr. Kelley. They lived near the Kelleys, in the same neighborhood. They were not friendly with the Kelleys; that is, not intimate neighbors or intimate friends; so when he (Heilig) couldn't come he would send the Artz woman over to find out how things were going, and the Artz woman would come over and sit down and talk, and being the stool pigeon for the railroad company—Mr. Gentry: I object to that statement, if your Honor please; that is an unfair statement; that's highly argumentative. Mr. Eagleton: I think the evidence will show that. The Court: Overruled. Mr. Gentry: Note our exception."

It would appear from defendant's brief that the complaint as to the statement concerning Mrs. Artz is the designation "stool pigeon", which, according to the brief, is "a very unpleasant epithet to apply to any one, especially a woman." It is not suggested just how such reference could have prejudiced defendant. We rule this assignment against defendant. Also, defendant complains of the further opening statement to the effect that Mrs. Artz reported to Heilig that it was "the time to make the kill", and that Heilig "was in his hunting clothes (on the evening of October 26, at plaintiff's home); he was hunting ducks or something that had come into season, and he was out after ducks with a gun and out after Kelley with a pen." No objection was made to the statement that it was "the time to make the kill"; and the court sustained the objection to the statement that Heilig "was hunting Ducks", etc., and the jury was directed to disregard such statement and there was no claim, at the time, that such was not sufficient.

■ On argument: The record shows the following: "Mr. Eagleton: Mr. Gentry said . . . when the law is against you, come strong on the facts. Find a single thing in the three instructions favorable to the defendant; find in there one for the defendant, how you can find for the defendant. The first instruction tells you under what circumstances you will find the release invalid; the second tells you how you will find the release was invalid if there was a condition attached to it; the third tells you the amount of damages. Where is this law that he talks about? Mr. Gentry: I object to that line of

argument, if your Honor please, because it is not a fair explanation of the instructions. Mr. Eagleton: The instructions, each one of them have been read to the jury and I don't find a single instruction here that sets up their defense. Mr. Gentry: I ask the Court to admonish the jury to disregard those remarks. The Court: Overruled: Mr. Gentry: Save my exception. Mr. Eagleton: I ask the jury to read them. I make that in answer to his argument that the law is against me.''

Also, on argument, was this: "In his phony argument that the general attorney (Mr. Freels) made—came down here in his pompous dignity—he said the only reason he got into it—he's too good for us —the only reason he got into this thing was that his own conscience shuddered when he thought of the contract. He wasn't going to take part. When did he learn of the 50 percent contract? (Wilbourn and Eagleton's contract with plaintiff.) He wasn't going to take part in it, he said. That's a phony statement because his own ▓▓▓ claim agent says he learned of the 50 percent contract the night he (Heilig) tried to perpetrate the crime. Mr. Gentry: If your Honor please, I object to that statement about perpetrating a crime. The Court: It's sustained. Mr. Gentry: Ask the Court to tell the jury to disregard it. The Court: Disregard that last statement. Mr. Gentry: And I ask your Honor to reprimand Mr. Eagleton for making it. The Court: Overrule the last motion. Mr. Gentry: Note our exception.''

Defendant says that the argument as to the instructions ''was calculated to mislead the jury into believing that because the court did not say in so many words that they must find for the defendant, if they did not find the facts hypothesized in the instructions for plaintiff, then they must find for the plaintiff, regardless of what they believed in regard to the facts hypothesized in the plaintiff's instructions.''

The full argument does not appear in the record, but we think a fair inference is that counsel, in what was said as to the instructions, was answering some argument made for defendant. Also, it is unlikely that a jury of intelligent men would get so confused as defendant implies. In the brief defendant complains that counsel ''denounced the argument of Mr. Freels as phony, etc. It will be noted that the objection made went only to the statement that the claim agent, Heilig, ''tried to perpetrate the crime'', and the objection to that was sustained and the jury told to disregard it. Defendant asked and the court refused to reprimand counsel for making such statement.

"The trial judge hears the testimony and the arguments, and in view of his opportunity to weigh and determine the likely or possible effect of the alleged prejudicial argument, we are inclined to defer to his rulings unless it appears that the protested arguments so patently pass legitimate bounds as to be manifestly prejudicial and the ruling of the trial court thereon a clear abuse of discretion.''

Cordray v. City of Brookfield (Mo. Sup.), 88 S. W. (2d) 161, l. c. 165. See also, Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S. W. (2d) 115, l. c. 120; Hancock v. Kansas City Terminal Ry. Co., 347 Mo. 166, 146 S. W. (2d) 627, l. c. 630. We do not think, in the situation, that the trial court abused discretion.

█ Is the judgment excessive? Such an assignment is always vexing, but "the only question is whether the amount of the verdict is within the bounds of reason and reasonably proportionate to the injuries proven. . . . No two cases are alike in this respect and every case must stand on its own peculiar facts. The law has fixed certain general rules for measuring damages in personal injury actions and these rules are given to the jury in the form of instructions, and the court must see to it, as best it can, that the jury gives due regard to such measure of damages and does not by the amount given palpably, through mistake or otherwise, disregard such rules. When the facts as to the injuries inflicted and losses sustained are similar, though never identical, there should be a reasonable uniformity as to the amount of verdicts and judgments in the various cases. Precedents are not altogether valueless even on the amount of verdicts which we have allowed to stand or caused to be reduced, but should be consulted whenever this question is presented." O'Brien v. Rindskopf et al., 334 Mo. 1233, 70 S. W. (2d) 1085, l. c. 1092; McNatt v. Wabash Ry. Co., 341 Mo. 516, 108 S. W. (2d) 33, l. c. 43; Philibert v. Benjamin Ansehl Co., 342 Mo. 1239, 119 S. W. (2d) 797, l. c. 804.

At the time of injury, plaintiff was 35 years old; expectancy 31.78 years; married, three small children; prior health good; education, about sixth grade; only means of livelihood was manual labor; earnings, at the time, $4.15 per day, or $1245 per year, counting 300 work days per year. Plaintiff's injuries are stated in his brief and defendant does not challenge correctness. The statement, in substance, is:

Plaintiff sustained an injury to his right shoulder, resulting in extreme atrophy and adhesions, or growing together of some of the structures in the shoulder area; a grating or crepitation upon movement and malposition of the shoulder blade. He also sustained an injury to the right knee, diagnosed as a dislocation of the semilunar cartilage, resulting in tenderness in the knee area, and causing disability and locking of the knee joint at times. He also sustained crushing fractures, and mashing of the body of the fourth lumbar vertebra, with the front portion of the vertebra being broken off, █ mashed down and narrowed, and with the broken off portion of the vertebra remaining ununited in January, 1942, but later uniting and leaving a deformed joint surface on the top of the vertebra, and causing a tilting of the vertebra resulting in damage to the spinal nerves emerging at that point. This damage to the spine and nerves

caused plaintiff great pain; caused rigidity of the erector spinae muscles; caused a destruction of the mechanics of the body in that there was a tendency of the spine and body to fall forward above the point of the fracture, and caused a condition of the right foot, known as "foot drop", and complete anaesthesia or numbness on the top of the right foot, resulting from nerve injury at the site of the fracture of the spine. The tendency of plaintiff's upper body and spine to fall forward, resulting from the fracture of the spine, necessitated the use of a strong steel body brace to keep plaintiff's spine erect, and plaintiff was compelled to use a cane to assist him in walking.

At the time of the trial, some fifteen months after his injury, plaintiff complained that his lower back and left hip pained him severely all the time—he could "hardly sit up" it hurt so bad—and that, as a result, he spent about half his time in bed during the daytime; he had pain in his right knee, and that knee would lock on him when he walked and that at night the muscles in his back and shoulder pained him. The medical testimony further showed that all of plaintiff's injuries and conditions were painful and permanent; that plaintiff was totally and permanently disabled; and that he would be compelled to wear permanently a strong body brace, such as he was wearing, to prevent his spine from buckling forward above the site of the fractures.

In the brief defendant concedes that "the evidence tends strongly to show that plaintiff suffered severe injuries which will cause him total and permanent disability, making it impossible for him henceforth to do manual labor, which was the only means of livelihood he had."

The present worth of $1245 annually over the period of plaintiff's expectancy, on the basis of 3 per cent, is $25,277.61. Plaintiff relies on Chesapeake & Ohio R. Co. v. Kelly, 241 U. S. 485, 36 S. Ct. 633, 60 L. Ed. 1117, and Gill v. Baltimore & Ohio R. Co., 302 Mo. 317, 259 S. W. 93, l. c. 97, to support the basis of 3 percent in making the calculation. In addition to loss of earnings, plaintiff is entitled to recover for the pain and suffering that he has sustained and will sustain. But all this, in connection with the verdict of $45,000, hardly squares with the rule of uniformity as to amount of verdicts.

It appears that in the original petition, plaintiff asked for $35,000, but thereafter amended to ask $50,000. Comparable injuries and loss of earnings considered, and endeavoring to be consistent with the rule of uniformity, as nearly as may be, we think the judgment is excessive by $15,000. Mickel v. Thompson, 348 Mo. 991, 156 S. W. (2d) 721; Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S. W. (2d) 311.

If plaintiff will, within 10 days after the filing of this opinion, file here a remittitur of $15,000, the judgment for $30,000 will be af-

316

firmed. Otherwise, the judgment will be reversed and the cause remanded. It is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.