**WARD v. MILLER.**

No. 7008.

District Court, Alaska.  Fourth Division.  Fairbanks.

Sept. 8, 1952.

E. P. McCarron, of Fairbanks, Alaska, for plaintiff.

R. J. McNealy, of Fairbanks, Alaska, for defendant.

PRATT, District Judge.

Both parties herein claim title through the ownership of Dave and Beatrice Dittman of the land in controversy herein. The Dittmans gave an option to purchase said property to Clarence Johnson and Bennie Jackson, which option was duly paid for and taken up by said optionees or their successor in interest, Travis M. Ward.

On February 1, 1949, when Bennie Jackson and Clarence Johnson owned said property, Bennie Jackson, without joining his co-tenant, Clarence Johnson, as lessor, executed a lease (Exhibit 1 herein) upon the land in controversy in favor of Charles and Goldie James, as lessees, to terminate on the 31st day of January, 1953. The rent therein reserved to the lessors was $400 per month. By an instrument of date June 2, 1949 (Exhibit G herein) said Jackson and said Johnson executed an instrument supplemental to said lease of February 1, 1949, and fixed the rent for the ground leased as $200 per month for the first five months of the calendar year and $400 per month for the balance of the year.

This supplemental lease was signed by both of said lessors. It cured the defect in said lease.

The notice to terminate tenancy (Exhibit F herein) states as a ground therefor that defendant permitted the

premises to be used for illegal purposes. As there is no evidence to support such an allegation, the same may be no further considered.

█ The notice to terminate the lease states as a ground for the termination that the lease (Exhibit 1 hereof) was assigned by the lessees, Charles and Goldie James, to the defendant without the written consent of the lessors.

The lease of February 1, 1949, provided that the lease could not be assigned by the lessees without the written consent of the lessors previously having been obtained. However, the matter of this unauthorized assignment was not made an issue in the case and was inferentially ratified by the lessors and their successor in interest, Travis M. Ward, by their failure to declare a forfeiture for such assignment when the assignee, Louise Miller, took possession of the property on the 9th of September, 1949, and retained such possession at all times thereafter to the knowledge of said lessors and said Travis M. Ward.

█ Also the acceptance and retention of the rent by plaintiff as mentioned in Exhibit F constitutes a waiver of the provision requiring the consent of the lessors to an assignment of the lease. Exhibit H likewise shows that even in 1951 the following checks of Louise Miller were given to the plaintiff and retained by her, to wit:

| 1–29–51 | No. 24322 | $225.50 |
| 2–27–51 | No. 24396 | 224.50 |
| 3–29–51 | No. 24504 | 223.50 |

and the total of those three checks is $673.50. This also constitutes a waiver of objection to an assignment without the consent of the lessors. Blessing v. Fetters, 1919, 40 Cal.App. 471, 181 P. 108; Batley v. Dewalt, 1909, 56 Wash. 431, 105 P. 1029; Knickerbocker v. Norton, 96 U.S. 234, 24 L.Ed. 689; Syracuse Sav. Bank v. D'Elia, 185 Misc. 928, 56 N.Y.S.2d 800; Hunt v. Shell Oil, 10 Cir., 116 F.2d 598; Warner v. Cochrane, 2 Cir., 128 F. 553.

The undisputed evidence of the defendant was to the effect that in the fall of 1949 Bennie Jackson came out to the property in controversy in this case and took away the piano. As defendant was in possession of the premises and Bennie Jackson could not have helped but see her there, it becomes apparent that he knew of or should have known of the assignment of the lease.

Defendant's further testimony was that in the spring of 1950 she talked with Travis M. Ward and told her about the floor buckling at the Owl Club, the name commonly used to describe the property in controversy in this case. The defendant asked Travis M. Ward to do something about the buckling floor and Travis M. Ward sent her husband out and he jacked the same up and remedied the trouble. Both he and his wife knew from the incidents mentioned that the defendant was in possession of said Owl Club.

In paragraph 3 of said eviction notice it is alleged as a ground therefor that Clarence Johnson did not join with his co-tenant, Bennie Jackson, in executing the lease of February 1, 1949. Such statement is true, but as hereinbefore explained it was cured by both co-tenants executing the instrument of June 2, 1949 above mentioned (Exhibit G).

Upon the 27th day of July, 1949, Bennie Jackson, Clarence Johnson, Charles James, and Goldie James met in the law office of Quincy Benton and agreed that an instrument should be executed allowing Charles and Goldie James to spend the rent money for July, August, and September, 1949, in gravelling and repairing the premises and putting in a furnace. All of said persons except Bennie Jackson also agreed to insert in said instrument an option provision allowing Charles and Goldie James to purchase the property any time prior to January 1, 1951, for the sum of $10,200 (one-half to be paid upon the exercise of the op-

tion and the balance paid at the rate of $200 per month with six percent interest on deferred payments).

The agreement was drawn up and signed by Clarence Johnson, Charles James, and Goldie James. Bennie Jackson did not sign it. He testified that he left Benton's office, stating that he would not consent to said option provision. Quincy Benton states that while they were waiting for the preparation of the instrument Bennie Jackson said he was going out to get a drink and that he would be back and sign the agreement then, but that he never returned. Whichever way it happened, it is certain Bennie Jackson never signed the agreement. The instrument named Clarence Johnson and Bennie Jackson as parties of the first part and made provision for the sale of the complete title of both Johnson and Jackson (Exhibit 2 herein). It made no provision for Charles and Goldie James to buy merely a half interest in the property. No provision was made to buy the half interest of either co-owner separate from the half interest of the other co-owner.

The undisputed evidence shows that when Clarence Johnson signed the instrument he stated to the others that the paper was no good unless it was also signed by Bennie Jackson. He took no action or made no statement which would indicate that he was selling his undivided interest even though Bennie Jackson did not sell his half interest. The instrument was left in the original condition with the two co-owners named as parties of the first part. The form of option extended to the title of both Clarence Johnson and Bennie Jackson and was never changed.

The option provision of the said agreement of July 27, 1949 (Exhibit 2) therefore was not binding upon Bennie Jackson or upon Clarence Johnson. Johnson's signing was a contingent matter and his actions and statements show that he did not intend that the agreement should be delivered unless Bennie Jackson joined in the execution thereof.

The contract was not a completed instrument and was not binding on either co-owner, as to said option provision. Stockyards Nat. Bank of South Omaha v. Bragg, 1925, 67 Utah 60, 245 P. 966; Kelley v. Ill. Central R. Co., 1944, 352 Mo. 301, 177 S.W.2d 435; Meredith v. Brock, 322 Mo. 869, 17 S.W.2d 345; First Nat. Bank & Trust Co. of Elmira v. Conzo, 169 Misc. 268, 7 N.Y.S.2d 334; Kinne v. Ford, N.Y., 52 Barb. 194; Ware v. Allen, 128 U.S. 590, 9 S.Ct. 174, 32 L.Ed. 563; National Bank of Ky. v. Louisville Trust Co., 6 Cir., 1933, 67 F.2d 97; Winter v. Kitto, 1929, 100 Cal.App. 302, 279 P. 1024; Wallace v. King, 1943, 205 Ark. 681, 170 S.W.2d 377; Willard F. Deputy & Co. v. Hastings, 1923, 2 W.W.Harr. 345, 123 A. 33; Bank of U. S. v. Chemical Bank & Trust Co., 1930, 140 Misc. 394, 246 N.Y.S. 595, 17 C.J.S., Contracts, § 62 (a) and (b), page 412.

On the 17th day of August, 1949, Clarence Johnson executed a quitclaim deed conveying all of his right, title, interest and estate in the property in controversy to Travis M. Ward, the plaintiff. This instrument was recorded upon the 12th day of October 1949.

On the 12th day of October, 1949, Bennie Jackson executed a quitclaim deed in favor of Travis M. Ward conveying all of his right, title and interest in the estate in and to said property. This deed was recorded upon the 12th day of October 1949. On the 17th of August 1949 Clarence Johnson executed an assignment of his rights to the Dittman option. The assignee was Travis M. Ward.

Travis M. Ward has not made any claim, in her pleadings or in her evidence that she was an innocent purchaser without notice. Consequently she is charged with notice of the actions of her grantors in the two quitclaim deeds and in the lease and amendment.

On the 9th day of September, 1949, Charles and Goldie James executed two instruments in favor of the defendant, Louise Miller. One of them was entitled "Agreement of

Sale." It quitclaimed as to the property in controversy, reciting that the interest of Charles and Goldie James was "a lease on said property dated February 1, 1949." It further provided that Louise Miller was to pay a balance due the Jameses of $2,000 in monthly payments beginning October 9, 1949, the payments to be in the sum of $300 monthly without interest and to be paid to Quincy Benton at his office and to be remitted by him to the Jameses. This instrument (Exhibit 4) was signed by Charles James, Goldie James, and Louise Miller, and duly acknowledged by all of them and witnessed by two witnesses.

The other instrument was entitled "Assignment" and in it was the recital that the Jameses were lessees under the lease of February 1, 1949, and it set forth the provisions of the lease as modified by the instrument of June 2, 1949 (Exhibit G). It further recited that they, the Jameses, had an option to purchase the property for $10,200, one-half down and the balance to be paid at $200 a month with interest at six percent, and that rent payments for October and thereafter should be credited upon the option price. The Jameses sold and transferred all their rights to the property in controversy (Exhibit 3) to defendant.

As the Jameses had no option to purchase the property in controversy as mentioned above, their conveyance of an alleged right to purchase the ground in controversy was of no avail to them or to their successor in interest, Louise Miller.

The lease of February 1, 1949 (Exhibit 1) as supplemented by the instrument of June 2, 1949 (Exhibit G) is for the period of time from February 1, 1949, to January 31, 1953. In consequence of the continuance of the term of said lease, it becomes necessary to ascertain whether or not the defendant was in default in the payment of any rent at the time the plaintiff brought this action, to wit, upon the 11th day of January, 1952.

Plaintiff's eviction notice (Exhibit F) shows that defendant had paid rent up to the first day of May, 1951, and that she had paid the sum of $73.50 on the rent for the month of May 1951. The undisputed testimony shows that defendant had the First National Bank of Fairbanks send 10 cashier's checks to the plaintiff without direction as to their application and which the plaintiff returned without any comment. The checks were dated and in the amounts as follows:

| | |
|---|---|
| 5–11–51 | $222.50 |
| 5–31–51 | 221.50 |
| 7–2–51 | 221.50 |
| 8–1–51 | 220.50 |
| 9–5–51 | 220.00 |
| 10–2–51 | 219.50 |
| 11–1–51 | 219.50 |
| 11–30–51 | 220.00 |
| 1–2–52 | 219.50 |
| 1–31–52 | 219.00 |
| Total | $2,203.50 |

(Exhibit H erroneously shows the above-mentioned 10 checks to total the sum of $1,577 instead of the correct sum of $2,203.50.)

As claimed by plaintiff, the rent due at the time of filing the complaint was as follows:

| | |
|---|---|
| $ 126.50 | balance for the month of May 1951 (Exhibit F) |
| 2,800.00 | for rent from the 1st of June 1951 to the 1st of January 1952 at $400 a month. |
| 200.00 | for the month of January 1952 |
| Total $3,126.50 | |

The defendant testified she thought the amounts of said checks were due and owing on her alleged option to purchase said Owl Club property. Those checks were introduced in evidence and were not tendered as rent money payment or to keep an earlier tender in present effect.

The first nine of said checks were dated before the commencement of this action. Their total is $1,984.50. Even if said checks had been tendered as rent payments, and even if the amount of the tenth check were counted with the other nine checks as a tender of rent, the defendant would have been in arrears in the sum of $923.

It is true that the defendant in tendering these cashier's checks erroneously thought she was making a payment upon an option. However, the defendant was indebted to the plaintiff for rent upon the lease and that was the only indebtedness she owed the plaintiff. As the checks came through the mail without any direction as to how they were to be applied, it was the duty of the plaintiff to apply the checks to the indebtedness of the defendant, as the plaintiff knew the checks came from the defendant. This knowledge is shown by the fact that the plaintiff returned the checks to the defendant.

Section 58–7–2, A.C.L.A.1949 provides that where a person to whom a tender is made does not at the time of the tender specify an objection to the form of the tender, the person to whom the tender was thus made is considered to have waived any objection to the kind of money or property constituting the tender.

It is not necessary to tender cash. A check, unobjected to, would constitute a proper tender. Hoogendorn v. Daniel, 9 Cir., 178 F. 765.

Therefore, the defendant upon January 11, 1952, was in arrears in her rent in the sum of $3,126.50 and plaintiff is entitled to judgment in her favor for possession of said property and for rent in the sum of $3,126.50 with

interest thereon at six percent per year from January 11, 1952 (not counting said checks as rent payments).

Findings of fact, conclusions of law, and judgment in accordance with the foregoing opinion may be prepared by the attorney for the plaintiff.

The plaintiff shall be restored to the possession of said property and shall be awarded costs and disbursements of action including a reasonable attorney's fee, to wit, the sum of $450 fixed by the Court as a reasonable fee in this case.