LAURA A. COLBY *vs.* LIFE INDEMNITY & INVESTMENT CO.

Argued May 23, 1894. Reversed June 15, 1894.

No. 8765.

**Unauthorized demand of assessment, may have misled the insured.**
　　*Held* that, under the facts of this case, the jury would have been justified in finding that, by reason of certain misrepresentations and unauthorized acts of the defendant insurance company (especially in demanding of the insured payment of an assessment in addition to his premiums) the insured was misled and induced to refrain from paying the premiums which he otherwise would have paid.

**This sufficient ground to have his policy reinstated on payment of all premiums due.**
　　*Held*, also, that this would be sufficient ground to entitle the insured, if living, to have his policy reinstated, or, if dead, to entitle the beneficiary to recover on it upon payment of all premiums due.

**Statements of an agent not within the scope of his agency.**
　　Certain statements of an agent of the defendant *held* inadmissible, because not within the scope of his agency.

**Erroneous instruction to jury.**
　　An instruction to the jury that, if the assessment was illegal, this would be sufficient excuse for the nonpayment of premiums, *held* erroneous, because it omitted other facts essential to a valid excuse.

Appeal by defendant, the Life Indemnity and Investment Company, from an order of the District Court of Houston County, *Jno. Whytock*, J., made February 6, 1894, denying its motion for a new trial.

Defendant is a corporation organized October 10, 1881, under the laws of Iowa and doing business at Waterloo in that state. On December 30, 1882, Herman Colby took out a certificate of membership in the company for the sum of $2,500. This certificate constituted him a member and entitled his wife, Laura A. Colby, if death occurred within ten years to the proceeds of one full assessment not to exceed $2,500, and if he lived to the end of the period, entitled him to $1,000 from the surplus funds of the company upon the surrender of his certificate of membership, or if there was not sufficient in the surplus fund as apportioned then to a two-fifths assess-

ment upon the members in his class, together with his share of the surplus fund as apportioned, in all not exceeding $1,000.    He paid the assessments required of him until November 10, 1886, when by a new contract between them it was provided that instead of receiving the proceeds of one full assessment not to exceed $2,500, the assured should receive, regardless of what an assessment might bring, the full sum of $2,500, and provided in lieu of assessments that the assured should pay a specific sum as a premium on the first day of each and every month during any continuance of the insurance and provided that the policy should lapse *ipso facto* on the nonpayment of this premium, with a condition however for reinstatement at any time within the period of sixty days upon certain conditions. This contract was complied with by the insured up to and including August 1, 1891.    He then ceased to pay his regular premiums and did not thereafter pay anything on the contract.    He died January 29, 1892.

The widow brought this action to recover the $2,500.    The company defended on the ground that the policy had lapsed for nonpayment of premiums.    At the trial she obtained a verdict for that sum with interest.    Defendant moved for a new trial.    Being denied it appeals.

*Wilson & Quick*, and *Harries & Duxbury*, for appellant.

.The plaintiff's theory of this case seems to be, first, that the company made an illegal assessment upon her deceased husband, and, second, that the illegal assessment constituted an excuse for the nonpayment of the regular premiums provided for in the contract of insurance.    Conceding that the assessment was illegal and that it was made with the fraudulent intent of driving out weak and sickly members, it was no excuse for the nonpayment of the regular valid premium due on the policy on the first day of every month. It was no excuse for the nonpayment of the premium due September 1, 1891, provided for in the policy, for the reason that the assured was bound to know the law of his contract.    *Aetna Ins. Co. v. Reed*, 33 Ohio St. 283; *Fulton* v. *Hood*, 34 Pa. St. 365; *Mayhew* v. *Phoenix Ins. Co.*, 23 Mich. 105; *Goss* v. *Peters*, 98 Mich. 112 ; *Perkins* v. *Trinka*, 30 Minn. 241; *Hall* v. *Wheeler*, 37 Minn. 522; *Erkins* v. *Nicolin*, 39 Minn. 461; *Town of Rochester* v. *Alfred Bank*, 13

Wis. 432; *Neff* v. *Rains,* 33 Wis. 689; *Kenyon* v. *Welty,* 20 Cal-637.

The contract of life insurance is unilateral in form. The company only is bound. To bind them the premium must be paid at the time stated in the contract, and time is the essence of the contract. *Mandego* v. *Centennial Mut. L. Ass'n,* 64 Ia. 134; *Madeira* v. *Merchants Exch. Mut. Ben. Soc.,* 16 Fed. Rep. 749; *Klein* v. *Insurance Co.,* 104 U. S. 88.

The Judge in attempting to direct the jury as to what would constitute an excuse for the nonpayment of the premiums, gave them instructions which were inconsistent, contradictory and liable to mislead, and for which the verdict cannot stand. *McCormick* v. *Kelly,* 28 Minn. 135; *Aetna Ins. Co.* v. *Reed,* 33 Ohio St. 283.

*E. H. Smalley,* for respondent.

A general exception to the whole of the charge of the court and to each part of it is insufficient. *Caldwell* v. *Murphy,* 11 N. Y. 316; *Smith* v. *Coleman,* 77 Wis. 343.

The defendant's exceptions were not properly taken. *Russell* v. *St. Paul, M. & M. Ry. Co.,* 33 Minn. 210; *Rheiner* v. *Stillwater St. Ry. & T. Co.,* 31 Minn. 193; *Rosquist* v. *Gilmore Furniture Co.,* 50 Minn. 192; *Carroll* v. *Williston,* 44 Minn. 287; *State* v. *Miller,* 45 Minn. 521.

Where a defendant requests several distinct charges to the jury, some of which are given and others refused, a general exception to the refusal of the Judge to charge in accordance with the requests is insufficient. An exception must point out the specific matter complained of. *Edgell* v. *Francis,* 86 Mich. 232; *Racine B. M. Co.* v. *Koust,* 51 Wis. 256; *Shull* v. *Raymond,* 23 Minn. 66; *Pound* v. *Port Huron & S. W. Ry. Co.,* 54 Mich. 13; *Lund* v. *Anderson,* 42 Minn. 201.

The evidence tends to show a deliberate scheme on the part of the company to put Colby out. The jury had a right to infer that the acts of the company were deliberately fraudulent. Whether the company had bad faith or not is, however, immaterial as the acts of the company, whatever the motive, misled Colby to his serious prejudice. *Hartford L. & A. Ins. Co.* v. *Unsell,* 144 U. S. 439;

*Beebe* v. *Wilkinson,* 30 Minn. 548; *Continental Nat. Bank* v. *National Bank of the Comm.,* 50 N. Y. 575; *Blair* v. *Wait,* 69 N. Y. 113; *Wyman* v. *Gillett,* 54 Minn. 536; *Tiffany* v. *Henderson,* 55 Ia. 405; *Insurance Co.* v. *Eggleston,* 96 U. S. 572. If the crafty conditions with which insurance companies fence in the rights of the assured, and the subtle arguments which their counsel found upon them were always to prevail, these corporations would be reduced to the simple function of receiving premiums for little or no risk.

MITCHELL, J. The defendant was originally organized under the laws of Iowa, by the name of the Union Mutual Aid Society, as a life insurance and endowment company under the "assessment" plan. December 30, 1882, it issued to plaintiff's husband, Herman Colby, a certificate of membership. Having subsequently amended its constitution and by-laws so as to change it into a regular mutual life insurance company, on November 10, 1886, it issued to Colby the "supplementary" contract or policy.

This, of course, superseded the original certificate, at least in so far as the two were inconsistent. The latter is on its face a plain ordinary policy of life insurance for a stated period, with the privilege of indefinite renewal or continuance by payment of a specified monthly premium. In the absence of any modifying agreement, the effect of it would be to extinguish all the rights of Colby under the "endowment" clause in the original certificate, and to release him from all "special two-fifths assessments" or other liability except for the monthly premiums provided for in the new or supplementary contract.

The defendant seeks to modify or add to the terms of this contract by certain circulars sent to its members in November and December, 1886. These circulars explain the reasons of the company for making the change in their business, and in some particulars state its views as to the construction and effect of the new or supplementary contract. In case of ambiguity in the language of that contract, these circulars might perhaps be resorted to, to aid in its construction, but they constituted no part of the contract, and cannot vary its terms. But, even if they could be referred to for any such purpose, it is clear from their contents that, while they state that the "endowment feature" of the old certificates will

be carried out by the company, yet they over and over again assure those who will accept or have accepted the supplementary contract that they are thereby released from all liability except for the regular premium stipulated for in the new contract. This is the very essence of the reason given for making the change, and is utterly inconsistent with the idea that the holders of the supplementary contract would continue liable to special two-fifths assessments. If the company intended to continue its liability on the endowment clause in the old certificates, it must have contemplated liquidating it out of the proceeds of the regular premiums. If it did not mean this, it was perpetrating an intentional fraud. Hence, whatever might be the rights of certificate holders not accepting the new contract against their fellow members who did, we are clear that the company itself had no right to assess against the latter any special two-fifths assessments. Therefore it had no right to levy any such assessment against Colby after November 10, 1886.

Subsequent to November 10th, Colby continued to pay his regular monthly premiums, the company claiming nothing more until August, 1891, as hereinafter stated. In 1889, for some reasons not fully explained, but which may be readily surmised, the company endeavored to obtain from the holders of the old certificates a waiver or release of all rights under the special two-fifths assessment clause, and an agreement to accept in lieu thereof, when their certificates matured, their equitable proportion of the "surplus" fund accumulated while the certificates were in force. They sent to Colby for execution a blank waiver or release of this character, by the terms of which its acceptance by the company was optional, unless all other members holding like certificates would sign like releases, in which event its acceptance by the company became obligatory. January 7, 1889, Colby signed this release, and sent it to the company, which retained it in silence until June 15, 1891, when it returned it to him, with notice that it could not accept it, because some other certificate holders had refused to sign like releases. Shortly following this, on August 15, 1891, the company notified Colby that it had made a special two-fifths assessment against him, amounting to $10.80, and payable in 30 days, to pay endowments on 18 certificates which had matured. On receipt of this notice, Colby, who had promptly paid all his premiums up to September 1, 1891, amounting in the

aggregate to several hundred dollars, apparently fearing that, if these assessments were to continue, it would be throwing money away to pay any more on his policy, and thinking he had better first find out where he stood, wrote to the company for information. The result proved that his fear was not unfounded, for on August 21st the president of the company replied, stating that there were over 700 certificates outstanding which matured before his, on which his assessment would amount to over $425, while there were in force only 246 certificates liable to assessment for his benefit, so that the most he could possibly get on the endowment clause in his certificate would be about $193. Colby, probably concluding from this showing that to continue to pay on his policy would be throwing money away (the correctness of which was proved by the fact that on September 15, 1891, the company made another assessment on him for $15), omitted payment of the premium due September 1st, and never paid anything more on his policy. He made no tender of the premium due September 1st; neither was there any evidence that, if he had, the company would have refused to receive it. But there was evidence to justify the jury in finding that he honestly supposed that the company had a right to make this assessment, in which case the payment of the premium, without paying the assessment, would not have prevented a lapse of his policy, and that, but for the unauthorized act of the company in making the assessment, and their wrongful implied assertion of the right to make future ones, Colby would have continued to pay his regular monthly premiums.

In November or December, 1891, the company notified Colby that the two-fifths special assessment "had been set aside," and offered to reinstate his policy upon payment of back premiums, and "furnishing satisfactory evidence of good health." This evidence he was unable to furnish, because he was then seriously ill of the disease of which he died, in January, 1892. Of course, if Colby's failure to pay his premiums was his own fault, the company had a right to insist on this certificate of good health as a condition of reinstating his policy; but, if such failure was caused by the misrepresentation or other unlawful act of the company itself, it had no right to require such a certificate, or anything except the payment of the premiums. After Colby's death the plaintiff, the bene-

ficiary of the policy, tendered payment of all back premiums due up to her husband's death, which the company refused to accept, insisting that the policy had lapsed by reason of the nonpayment of both the premiums and assessments.

From what has been said, it follows that the policy did not lapse because of the nonpayment of the assessments, and the only question is whether, under the facts, it lapsed because of the nonpayment of the premiums. The substance of defendant's contention is that the misrepresentation, if any, of the company, was not made with any fraudulent intention; also that it was at most a mere representation as to the law of the contract, which could not be a ground for relief; and also that the fact that the assessment was unauthorized furnished no excuse for the nonpayment of the premium.

It is not necessary that the misrepresentation should have been made with a fraudulent intent to deceive. It is enough if it was reasonably calculated to mislead, and did mislead, Colby to his prejudice.

It may be here added that, under the circumstances, a representation by the company that it had a right to make the assessment included, by necessary implication, a representation that it had a right to make future ones, and that, if these assessments were not paid, the policy would lapse, notwithstanding the payment of the premiums.

We recognize that the general rule is that, as between parties bearing no fiduciary relation to each other, a mere misrepresentation of law by one party, or a mere mistake of law by the other party, is no ground for relief. But it seems to us that, in view of all the facts, the acts of the company amounted to more than a mere misrepresentation of law. It originally organized its business on a plan financially vicious and unsound, and, in its subsequent efforts to change its base, its conduct was characterized throughout by a course of backing and filling and hedging that was well calculated to deceive and mislead men of ordinary intelligence, but not experts in the insurance business. Indeed, the company itself did not seem to know where it stood. The disparity of the parties must also be borne in mind. Ordinary men are not usually acquainted with all the intricacies of insurance contracts, while the insurer is presumed to be an expert on the subject; and it is a matter of common knowl-

edge that the insured are accustomed to rely largely on the insurer for information as to their rights and liabilities. The somewhat complicated history of the transaction did not present a simple legal proposition, familiar to the ordinary mind, but a complex question, involving an element of fact as well as of law, and about which mistake or misunderstanding might well be supposed to exist. The company had for years been representing to Colby, by both words and acts, that he was no longer liable on the special two-fifths assessment clause in his original certificate, and it was a fair inference that he had paid his premiums on the faith of this representation. The act of the company in making an assessment against him in August, 1891, amounted to a representation that he still remained liable under the clause referred to. The reason for this change of front was not stated. Colby might have supposed that it was for some cause not appearing on the face of the policy; as, for example, the inability of the company to induce some of the old certificate holders to come into the new arrangement. But, even if the misrepresentation be deemed to have been merely as to the law of the contract, still it seems to us that the relation of the parties was such as to render the misrepresentation a ground for relief to the extent of preventing a forfeiture. While the company (a mutual one), as a corporate entity, and its members, were, in one aspect of the case, opposite contracting parties, yet, in another aspect, they occupied a sort of fiduciary relation to each other, somewhat analogous to that of principal and agent, or trustee and cestui que trust; and it is a familiar principle that, when the contracting parties bear a fiduciary relation to each other, a misrepresentation as to the law of the contract may be a ground for relief.

If Colby knew that the assessment was illegal, the act of the company in making it would not be sufficient excuse for his not paying or tendering his premium; but if, by the misrepresentation of the company, he was led to honestly and reasonably believe that the assessment was valid, and that he would have to pay it, as well as his premiums, to keep his policy from lapsing, and he was thereby caused to refrain from paying the premium, which he otherwise would have paid, as the jury might have found, this would constitute a valid excuse. Our view is that, if the facts were as we have indicated, Colby, if living, would have been entitled to a reinstatement

of his policy on payment of all premiums due; and, if this is so, it would seem to follow that plaintiff, as the beneficiary of the policy, would be entitled to recover the amount of it, less these premiums. There was evidence to justify the verdict, and it would have to stand but for errors of law occurring at the trial.

We have not considered all the exceptions to the admission of evidence, as most of them were either not well taken, or the alleged errors not such as are likely to occur again; but, with a view to another trial, we would say that the evidence as to what the witness Field stated to Colby ought not to have been admitted, because it does not appear that such statements were within the scope of Field's agency.

The most serious error, however, was in the manner of submitting the case to the jury. As a whole, the charge of the court was rather obscure, on some points inconsistent, and not well calculated to inform the jury what the precise issues were, or by what rules of law they were to be guided in passing upon them. But the most grave error was by giving plaintiff's fourth request. Stripped of all verbiage, the effect of this was to instruct the jury that, if the special two-fifths assessment was illegal, this was sufficient excuse for Colby's not paying his premium. This was altogether too broad. It excluded the very facts which were essential to plaintiff's right to recover, to wit: That Colby was led by this act of the company to honestly and reasonably believe that the assessment was legal; and that he would have to pay it, as well as the premium, in order to continue his policy; and that he was thereby induced to refrain from paying his premium, which he otherwise would have paid. There is nothing elsewhere in the charge that corrected this error.

Order reversed.

(Opinion published 59 N. W. 539.)