(110 App. Div. 52)

## BUCK v. HOUGHTALING et al.

(Supreme Court, Appellate Division, Second Department. December 29, 1905.)

1. BROKERS—PURCHASES ON PRINCIPAL'S ACCOUNT—RATIFICATION OF ACT.
    One who sold short through a broker ratified the act of the broker in buying shares on her account on a rising market, where, subsequent to the purchase, she was informed thereof by the broker, and, while protesting that she did not think the broker had acted properly or within his rights, acquiesced in the accounts and accepted the statements of indebtedness arising out of the transaction furnished her by the broker, made arrangement for the liquidation of the indebtedness, and ultimately discharged it in accordance with such arrangement.
    [Ed. Note.—For cases in point, see vol. 8, Cent. Dig. Brokers, § 29.]

2. PAYMENT—RECOVERY OF PAYMENTS—GROUNDS—DURESS.
    Where a stockbroker purchased stock on a rising market to close out a short account of a customer, and the customer afterwards deposited other shares of stock with the broker as collateral security for the sum due the latter on account of the purchase, the fact that the stock pledged as collateral was in peril of sale in case the customer defaulted in the payment of the indebtedness, according to the agreement under which the stock was pledged, did not, in the absence of a threat by the broker to sell the stock in violation of the agreement, constitute duress in making the payments.

3. SAME—ACTIONS—BURDEN OF PROOF.
    Where collateral is pledged to secure the payment of money, the burden is on the pledgor to show that payments made by him are extorted from him by threat of an illegal sale of the collateral.

4. CONTRACTS—VALIDITY OF ASSENT—DURESS—WAIVER.
    Duress in the procurement of a contract is waived by three years' silence and acquiescence in the contract, without giving any indication of repudiation thereof.
    [Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, § 1183.]

5. SAME—WHAT CONSTITUTES DURESS.

> Where stock was deposited with a broker as margin for a short sale of other stock, and the broker bought stock on a rising market to close out the short account, the retention of the margin by the broker as collateral for the balance due on the short account did not constitute duress, compelling the customer to ratify the closing of the account by the broker, where the latter did not sell or threaten to sell the stock, and did not use the possession of the stock as a means to compel the making of the ratifying agreement, but such agreement was made voluntarily by the customer, who also agreed to permit the stock to remain in the broker's hands as security for the performance of the ratifying agreement.

Appeal from Trial Term, Kings County.

Action by Henrietta L. Buck against Warren R. Houghtaling and another. From a judgment in favor of defendants, plaintiff appeals. Affirmed.

Argued before BARTLETT, JENKS, HOOKER, RICH, and MILLER, JJ.

Roger Foster, for appellant.
John Notman, for respondents.

JENKS, J. On May 6, 1901, the plaintiff ordered the defendants, who are stockbrokers, to sell "short" 100 shares of Northern Pacific Railway Company Stock. The market went against the plaintiff, and upon demand she increased her "margin" of $1,500, deposited on May 6th, by a further sum of $1,500. On May 9th, the opening price or this stock was 170; at 11 a. m. it increased to 700 and more; between 12:45 p. m. and 2 p. m. it decreased to 500, and thereafter fluctuated between that figure and 325, which was the price at the closing of the Stock Exchange. On May 9th at some time before noon the defendants bought 100 shares of this stock on account of the plaintiff at 300. The plaintiff asserts that such purchase was made without instruction from her or previous notice to her or any further remand for margin upon her. She sues to recover the sum which she has paid in settlement of the account. Assuming that the purchase of the stock on May 9th was a wrongful act, I am of opinion that the plaintiff ratified it. Mr. Drakeley, an employé of the defendants, was her adviser in her venture, and her medium of communication with them in several instances. She testifies that after the defendants had bought the stock on her account she received the information by telephone, and that she saw Mr. Drakeley that evening, and then said that she didn't think there was anything right about it, and Mr. Drakeley said that she would have to pay. Soon after she received from the defendants a written statement of the purchase, with details, dated May 9, 1901. This venture, beginning with the "short sale" on May 6th, and ending with the purchase on May 9th, alone was the basis of her indebtedness to the defendants. She could not mistake the transaction. On May 15, 1901, she paid on account to the defendants $5,000; on July 12, 1901, $3,000. Later she instructed the defendants to sell 100 shares of 200 shares of certain stock deposited with them for security, and to credit her account with the proceeds, which was done. On January 28, 1903, she paid the balance of $1,780.80. During this period the defendants sent to the plaintiff statements of her account in detail—on June 30, 1901,

July 1, 1901, March 1, 1902, April 14, 1902, July 15, 1903, and January 28, 1903. In her letter dated July 11, 1901, inclosing a check for $3,000, she wrote that, if she figured correctly, the defendants had charged her 6 per cent., instead of 4, "as Mr. Drakeley said they would do." "My understanding with him is that I am to have 18 months to pay the balance due to you, partial payments to be made as convenient during that time; that you are to charge me 4 per cent. interest; also, that you are not to sell my securities unless I fail to pay you at the end of the 18 months, and not even then without giving me notice thereof." The defendants answered on July 17th, acknowledging the check, admitting the error in the interest charge, and then wrote:

"We will carry the balance due us, and against which you have given us as security two hundred (200) shares of United Shoe Machinery Co.'s stock, worth now about 36, 18 months, or until January 1, 1903, and not sell your securities before that time, and not then without notice to you, provided that in the meantime, should the security decline in value, you will give us additional collateral to protect us against loss, should we have occasion to ask you for it. You can, at your convenience at any time make payments on your indebtedness, and at any time upon the full payment of your debt we will return your securities to you."

On January 9, 1903, the defendants wrote to the plaintiff:

"Referring to your letter of July 17, 1901, as the time which we agreed upon to carry your debit balance will shortly expire, we would be very much obliged if you would indicate to us what you would like to do in regard to the settlement of the balance due us, amounting to $1,807.01, and against which we hold one hundred (100) shares of United Shoe Machinery stock."

On January 11, 1903, the plaintiff answered that she would settle the account immediately after the 15th of the month, and asked them, if that was satisfactory, to send her a statement in full. On January 14th she wrote:

"Will you please send me a full statement of the entire account as it appears on your books from the date when the indebtedness was contracted, including all debits of interest and payments by me? Just as soon as I can examine and find it correct, I will send check for balance due you."

On June 12th the defendants sent the statement, and on January 26th, the plaintiff wrote:

"I have made an examination of your account, and, computing the interest on the basis of your figures, I make the amount due you $1,798.80. I inclose with this a copy of your statement as I have made it up. If you find it correct, and will send one of your clerks to my house on Wednesday morning next with my U. S. M. stock, I will give you the amount."

The plaintiff also testifies:

"Before I wrote Houghtaling & Co., telling them that I had made an examination of the account," etc.

There is no evidence, save the bit of testimony of her complaint to Mr. Drakeley when she first heard of the sale, that she ever made any complaint or objection in any way or at any time to the defendants. She did not repudiate the accounts, but accepted them. She did not challenge the act of purchase, but she confirmed it. With full knowledge that the purchase of May 9th was the sole basis of any indebtedness to the defendants she acknowledged the debt, agreed to pay it, and did pay it in accord with her agreement. I think a ratification

of the purchase of May 9th is plain.    Gillett v. Whiting, 141 N. Y. 71, 35 N. E. 939, 38 Am. St. Rep. 762.    The remark to Mr. Drakeley, made on the day or evening of the purchase, cannot save the plaintiff, in view of her long-continued course of acquiescence in the accounts, acceptance of the statements, acknowledgment of her indebtedness, and discharge of that obligation.    Nor do I think that the plaintiff is materially aided by her testimony to the effect that, when she sent her statement of correction to the defendants, she "did not believe they had a right to buy in the Northern Pacific stock on my account."    Acts of ratification cannot be avoided by a belief that the act ratified was wrong, else thoughts would nullify acts.    On the other hand, if she thought the purchase was wrong, she cannot now protest that she was ignorant of the character of the act, in palliation of her conduct in ratification.    In Gillett v. Whiting, supra, the court, per Finch, J., said:

"Passing by some trivial objections based on the form of answers made, we come to the exception to the court's refusal to charge that, 'to make the defendant liable for a ratification of an unlawful sale, it must appear to the satisfaction of the jury that he knew his legal rights.'    What rights were referred to, or how the plaintiff was to prove the extent of defendant's legal knowledge, we are not told, nor why the latter, instead of asserting ignorance, explicitly declared that he knew plaintiff had violated his contract by selling his (defendant's) property.    No ground existed for such a charge, even if in any conceivable case it could be justified.    It cannot be necessary to argue seriously that there was no error in the court's refusal."

But the learned and able counsel for the appellant insists that the plaintiff may complain of duress, in that the payments made from time to time in discharge of the account were compulsory because necessary in order to save her stock, which was deposited with the defendants as security from sale by them; and we are cited to Stenton v. Jerome, 54 N. Y. 480, as conclusive authority.    The plaintiff testifies:

"How much money I gave them I couldn't quite say.    I think there is an account of it there.    Looking at this statement of account, it was $3,500, I think, and I subsequently deposited with them some shares of stock.    I think there were 200 shares of United Shoe Machinery.    I think that was deposited the next day after the sale.    *    *    *    I didn't pay this money [referring to the payments on account of the indebtedness] all at once.    I paid it in installments.    I deposited with them some security, the shares of stock that I spoke of—200 shares, I think they were—of the United Shoe Machinery stock."

It appears, then, that this stock was not "margin" to protect the plaintiff in her "short sale" of 100 shares of the Northern Pacific stock, but was a deposit as security for the indebtedness which she had incurred as the result of the purchase by the defendants on her account on May 9, 1901.    The agreement, as indicated by the correspondence and the course of the parties, was that such stock should remain with the defendants as security, that the plaintiff would pay off her indebtedness by installments, and that the stock would not be sold save on her default and after due notice to her.    If this were the agreement, of course she had to keep her part, and of course the payments which she would now recover were made, in a sense, "to save her stock." The stock was not in peril of sale by the defendants so long as she kept her agreement.    If she did not, she agreed that it might be sold

by them. I cannot see how the existence of this right contingent on her default constituted duress. It is not pretended that the defendants ever threatened to depart from their agreement by selling the stock in violation of the conditions of its deposit. There might be duress if the defendants had threatened to sell the stock when they had no right to the money to be paid pursuant to this agreement. Briggs v. Boyd, 56 N. Y. 289. In such case the onus is upon the plaintiff to show that he did not owe the money, but that it was extorted from him by threat of an illegal sale. Id. But in this case the plaintiff, coming into court with her plea of duress, is met by her ratification of the act on which her indebtedness is based, which indebtedness is the subject of an agreement that made a sale of the stock possible only in the event of her violation of that agreement. And further, so far as the agreement itself·is concerned, there is ample proof that any duress, if duress there were, was waived. In Am. & Eng. Ency.. of Law (1st Ed.) vol. 6, p. 21, it is said, with citation of many authorities:

"Where a contract is sought to be avoided as procured under duress, the party wronged must proceed promptly. If he remains silent, keeps the property received, or recognizes the contract by making payments thereon, he will be held to have waived the duress."

In O. P. R. R. Co. v. Forrest, 128 N. Y. 83, 28 N. E. 137, the court say (page 93 of 128 N. Y., page 139 of 28 N. E.) :

"One entitled to repudiate a contract on the ground of duress should, like one who attempts to repudiate a contract on the ground of fraud, act promptly."

The agreement was made in 1901. There is not a vestige of proof of repudiation of this agreement contemplating the discharge of the indebtedness, save as it is indicated by this action begun on May 1, 1904.

Even if the stock had been originally deposited as margin for the short sale, there is not sufficient proof that the defendants exercised any duress. They did not sell, or threaten to sell, the stock to recoup them for the purchase. They did not use the possession of the stock as a means to compel the making of the agreement for the discharge of the indebtedness. On the contrary, they retained possession, and it became the subject of the subsequent agreement whereby the plaintiff on the one hand.affirmed the indebtedness, agreed to pay it, and also agreed that the stock should remain in the defendants' hands as security for her performance, with the right of sale in them upon notice, in case of her default. Stenton v. Jerome, supra, does not apply, for the reason that there was a finding in that case that Stenton did not assent to the account. The controlling rule in that case is found in the sentence quoted in the opinion from·Harmony v. Bingham, 1 Duer, 209 :

"If a party has in his possession goods or other property belonging to another, and refuse to deliver such property to that other, unless the latter pays him a sum of money which he has no right to receive, and the latter, in order to obtain possession of his property pays that sum, the money so paid is a payment by compulsion."

But, if I have construed the effect of the course and the conduct of the plaintiff in her dealings with the defendants after the purchase rightly, there was no refusal to deliver this stock by the defendants,

unless the plaintiff paid them a sum of money which they had no right to receive; and therefore the authority cited does not apply to the facts in this case.

I advise affirmance of the judgment, with costs.   All concur.