CRAIG, Respondent v. THE NATIONAL FARMERS UNION AUTOMOBILE AND CASUALTY COMPANY, Appellant

(78 N.W.2d 464)

(File No. 9547. Opinion filed September 21, 1956)

**Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for Defendant and Appellant.

**Donald J. Porter,** Chamberlain, **Fred J. Nichol,** Hitchcock, **Nichol & Lassegard,** Mitchell, for Plaintiff and Respondent.

HANSON, J.   The plaintiff, Paul E. Craig, was injured and his wife, Anne S. Craig, died as the result of injuries sustained in an automobile collision near Reliance, South Dakota, on July 1, 1951.   The other car involved was a 1946 Pontiac driven by Gordon Jensen, a son of the owner, James W. Jensen, Sr.   Action was brought against Gordon Jensen and on May 27, 1952 judgment was entered in favor of plaintiff, Paul E. Craig, individually, and as Special Administrator of the Estate of Anne S. Craig, in the amount of $23,770.79, together with $123.66 costs.   Executions on the judgment were returned unsatisfied.

The present action is brought by plaintiff as an unsatisfied creditor to recover the amount of his judgment from the defendant insurance company.   The plaintiff contends defendant's liability Policy No. 45467 issued to James W. Jensen, Sr., was in force and insured the 1946 Pontiac, and its driver, Gordon Jensen, on July 1, 1951.   The defendant denies liability and asks for reformation of the policy.   The defendant appeals from the judgment entered in favor of plaintiff.

The facts are determinative of the issues.   Summarized as briefly as possible they show that in 1949 James W. Jensen, Sr., was a farmer near Lyman, South Dakota.   He owned a 1946 Pontiac insured under defendant's Policy No. 45467.   The limitations of liability against bodily injury were $25,000 each person, $50,000 each accident, $5,000 property damage, and $1,000 medical payments.   The policy period was from August 7, 1949 to August 7, 1950.

Jensen, Sr., had two boys, James, Jr., and Gordon, who owned a Jeep.   The Jeep was insured by defendant's Policy No. 48376 in the name of James W. Jensen, Jr.   The effective period of this policy was from October 10, 1949, to October 10, 1950.   Applications for the policies were written by a

cousin, Jerome V. Jensen, a farmer who wrote insurance for defendant as a side line.

On August 7, 1950 Jensen allowed the Pontiac policy to lapse. Shortly thereafter he purchased a new 1950 Chevrolet. On September 23, 1950 Jensen informed defendant's agent he wanted liability insurance on the new Chevrolet. An application requesting a new policy (Exhibit O) on the Chevrolet was prepared by the agent and signed by Jensen, Sr. Jensen also informed the agent he wanted liability insurance on his 1946 Pontiac for one year and collision insurance on the Pontiac for a term of six months only because of a lien. The agent expressed some doubt as to whether or not a policy of that nature could be written. Jensen did not orally request, or consent to, a lesser liability term than one year. The agent prepared an application for a new policy (Exhibit N) on the Pontiac for a term of six months only asking for bodily injury liability coverage in the amounts of $10,000 each person and $20,000 each accident. The application was signed but not read by Jensen. At the same time the Jensens wanted credit on the Pontiac policy for the remaining insurance on the Jeep. Accordingly, the agent prepared Exhibit M, a car transfer application, referring to Policy No. 48376, which was signed by James W. Jensen, Jr. The agent forwarded the applications to the defendant's State Office with a letter requesting that "the insurance on the Jeep (Policy No. 48376) be applied (dividend and remaining value till due date) to the insurance on the Pontiac".

In October 1950 the company mailed the insured a "Renewal Premium Receipt" (Exhibit E) and a Notice (Exhibit D). These instruments informed the insured his 1946 Pontiac was insured by Policy No. 45467 for a period of one year commencing September 27, 1950. He relied on these instruments as affording the insurance he requested.

Exhibits E and D, as a matter of fact, were inadvertently issued by defendant's employees in processing Jensen's applications. Instead of issuing new polices on the Pontiac and Chevrolet, in accordance with the applications, the defendant proceeded to effect coverage on the two cars by

a series of changes and transfers on their records. These changes and transfers were as follows:

(1) Lapsed Policy No. 45467 was reinstated and the 1950 Chevrolet substituted for the 1946 Pontiac. The limits of liability were reduced and the policy period was made effective from September 27, 1950 to September 27, 1951, and

(2) The 1946 Pontiac was substituted for the Jeep in Policy No. 48376. A $50 deductible collision coverage was added and the policy was made effective until April 10, 1951.

After this series of changes the Pontiac was mistakenly insured in the name of James W. Jensen, Jr. The changes and transfers were reflected in a number of notices which were eventually sent to the agent for delivery. Before they were delivered Exhibits D and E, above mentioned, had been received by Jensen. The agent delivered the various endorsements on November 3, 1950. Mrs. Jensen was home alone and the agent placed the notices and endorsements with the old policies which were kept in a cupboard. The agent did not explain their meaning or significance. He did, however, collect $6.90 from Mrs. Jensen for the balance due on the premium.

On April 20, 1951, Policy No. 48376 was marked "lapsed" on defendant's records for nonpayment of premiums. Prior thereto the company had sent two "premium due" notices to James W. Jensen, Jr.

In May, 1951 the Jensens had the agent check their automobile insurance. He did not then, or at any time, explain the mistake in the issuance of Exhibits E and D. Nor did he explain, or inform the insured the Pontiac Policy had lapsed. Instead he informed Mrs. Jensen the insurance on the Pontiac was "Okay". Following the accident the agent called the State Office to determine the status of the Pontiac insurance. Jensen was not advised until after the accident that Exhibits E and D had been issued in error and the company denied liability on the Pontiac policy.

The defendant seeks to be relieved of the effect of Premium Renewal Receipt (Exhibit E) by having it reformed to show the 1950 Chevrolet instead of the 1946 Pontiac therein. "Reformation" is described as "that re-

medy in equity by means of which a written instrument is made or construed so as to express or conform to the real intention of the parties when some error or mistake has been committed." 76 C.J.S., Reformation of Instruments, § 1, p. 327. The person seeking reformation must prove his case by clear, unequivocal and convincing evidence. Bedford v. Catholic Order of Foresters, 73 S. D. 511, 44 N.W.2d 781. A mere preponderance of the evidence is not sufficient. The defendant has not sustained that burden of proof. Exhibit E reflects the insurance coverage Jensen orally requested and wanted. There is no evidence that Jensen intended either car to be insured under an old policy. Certainly he did not intend the Pontiac to be insured in the name of his son. The trial court found it was the evident intention of defendant's agent and Jensen that new policies would be issued on both the 1946 Pontiac and the 1950 Chevrolet. As stated in the case of Clark v. Bergen, 75 S.D. 48, 59 N.W.2d 250, the court only reforms and does not undertake to make a contract for the parties.

The mere failure of the insured to read the application will not bar recovery in this case. Quinn v. Mutual Benefit Health & Acc. Ass'n of Omaha, 244 Iowa 6, 55 N.W. 2d 546. The majority of the cases hold that such failure is not negligence under the circumstances. 4 Appleman, Insurance Law and Practice, § 2913. As stated in 29 Am.Jur. under the title of Insurance, § 253: "This result is reached in recognition of the fact that policies of fire insurance are rarely examined by the insured and even where examined are not always enlightening to him, due to the technical and complicated language in which the contract is usually couched. Another practical factor considered in reaching such a result is that the applicant usually tells the insurer's agent of his coverage necessities and relies on the agent for a policy in accordance therewith. For these reasons, most courts do not demand the same degree of vigilance and critical examination of fire insurance policies as would be expected of some other instruments". The same principle applies to this case. See also 44 C.J.S., Insurance, § 232, p. 971; Pfiester v. Missouri State Life Ins. Co., 85 Kan. 97, 116 P. 245. Our court has recognized the right of an insured

to rely on the superior knowledge of the agent respecting insurance matters. In the case of Peterson v. Great American Ins. Co., 74 S.D. 334, 52 N.W.2d 479, 481, the court said: "Insurance is a complicated transaction, and its niceties are not generally understood by the layman. The cases recognize this fact and place emphasis thereon." In the case of Colby v. Life Indemnity & Investment Co., 57 Minn. 510, 59 N.W. 539, 542, the court said: "The disparity of the parties must also be borne in mind. Ordinary men are not usually acquainted with all the intricacies of insurance contracts, while the insurer is presumed to be an expert on the subject; and it is a matter of common knowledge that the insured are accustomed to rely largely on the insurer for information as to their rights and liabilities."

■■ It would be inequitable to charge the insured with the multiple errors and omissions of the defendant in this case. The confusion was set in motion when the company, in order to save expense, set out to graft the new coverage on old policies. Thereafter they inadvertently issued Exhibits E and D which the insured relied upon for insurance to his prejudice. He had a right to rely thereon. "The renewal receipt is more than a mere receipt for money; it is evidence of a contract." 44 C.J.S., Insurance, § 287; also see SDC 31.0601. The company had the plain legal duty to notify the insured of their error after its discovery by them. This was never done. Neither were Exhibits E and D ever directly cancelled, recalled, or countermanded. The company was content to rely on the subsequent notices to correct, and rectify, the effect of Exhibits E and D. These were never shown to the insured, or their importance and effect explained.

According to the company's records the Pontiac was insured in the name of Jensen's son. Because of this error premium due notices were sent to the son. The evidence does not disclose that Jensen had any notice or knowledge premiums were due on the Pontiac policy or that it would, and did, lapse at the expiration of six months. Jensen paid all the premiums requested by the agent.

■ From a consideration of all the facts we conclude the defendant is estopped from denying liability on the 1946

Pontiac at the time of the accident. This estoppel arises by reason of the defendant's own acts and course of dealings whereby the insured was allowed to believe, and did believe, he was protected. The case comes fairly within the rule stated in the recent annotation appearing in 48 A.L.R.2d 1094.

The trial court found the limits of that liability to be $25,000 each person, $50,000 each accident, $5,000 property damage, and $1,000 medical payments. The insured applied for bodily injury liability not to exceed $10,000 each person and $20,000 each accident. He is entitled to no more under the doctrine of equitable estoppel. As so modified, the judgment of the trial court is affirmed.

No costs will be taxed.

All the Judges concur.