**FARMERS INSURANCE EXCHANGE,**
Plaintiff-Respondent,

v.

**FARM BUREAU MUTUAL INSURANCE COMPANY and Norma Jane Carty,**
Defendants-Appellants,

and

**William E. Johnson et al., Defendants.**

No. 58851.

Supreme Court of Missouri,
En Banc.

May 12, 1975.

Schroff, Keeter & Glass, Inc., Bob J. Keeter, Springfield, for plaintiff-respondent.

Donald E. Bonacker, Springfield, for defendants-appellants, Farm Bureau Mut. Ins. Co. and Norma Jane Carty.

FINCH, Judge.

This is a declaratory judgment action wherein Farmers Insurance Exchange (Farmers) requested a determination that an automobile insurance policy previously issued by it to defendant Norma Jane Carty had not been renewed and therefore did not provide coverage for an accident between her car and an automobile occupied by the defendants Johnson. Farm Bureau Mutual Insurance Company (Farm Bureau) was named as a defendant because it had a policy of insurance on the Carty automobile at the time of the collision. The Johnsons, most of whose claims had been settled by Farm Bureau, did not appear and defaulted. Farm Bureau sought by counterclaim to establish pro rata liability on the part of Farmers with respect to claims arising from this accident and Mrs. Carty counterclaimed to obtain certain benefits not paid by Farm Bureau. The trial court, hearing the case without a jury, found for Farmers on its petition and against Mrs. Carty and Farm Bureau on their counterclaims. The latter two parties then appealed to the Missouri Court of Appeals, Springfield District, which reversed, holding that the Farmers policy had been renewed and that the trial court should compute its liability to Mrs. Carty and Farm Bureau and enter judgment accordingly. On application of Farmers the case was ordered transferred to this court. We will now decide it as though here on direct appeal. Art. V, § 10, Mo.Const., V.A.M.S. We affirm the judgment of the trial court.

The evidence supports the recital of facts which follows. For several years Mrs. Carty lived at Point Lookout, Missouri, but in August of 1971 she moved to Mansfield, Missouri. During the time when Mrs. Carty lived in Point Lookout she had an automobile insurance policy with Farmers that was serviced by Gerald Huff, Farmers' agent in Branson. By its terms it was to expire on November 18, 1971, unless the policy was renewed. Aft-

er she had moved to Mansfield, Mrs. Carty received a premium notice from Farmers but after considering the matter decided not to renew that policy and did not mail in the premium. After passage of the premium due date, Farmers, as was its regular business custom, sent Mrs. Carty a printed expiration note which stated:

"Although the due date has passed you can still accept the Company's offer to renew your policy. Payment within 15 days after due date will renew your policy without interrupation of coverage."

Meanwhile, Mrs. Carty had applied on November 16, 1971, to Farm Bureau for coverage and a policy was issued by that company on November 22, 1971, effective November 18, 1971. Mrs. Carty testified that when she purchased the Farm Bureau policy she had no intention to continue insurance with Farmers and knew that its policy would lapse.

On November 24, 1971, Mrs. Carty was involved in a collision with the automobile of the Johnson family. Mrs. Carty was injured and hospitalized temporarily in Clinton, Missouri, and on November 27, 1971, was transferred to a hospital in Kansas City.

On November 29, 1971, agent Huff read a newspaper account of the accident in which Mrs. Carty was involved. He promptly verified that she was the same person whom his company had insured. In so doing he became aware from his records that the renewal premium was then several days past due and that the policy would not cover the accident if the premium thereon was not paid within the grace period which would expire at midnight on December 3, 1971.

He discussed this information with Loren Duncan, a real estate salesman who had a desk next to Huff's in the office of a

real estate company in Branson, Missouri. According to Huff, when he and Duncan talked about Mrs. Carty's situation, both on November 29, 1971, and subsequently, they discussed the possibility that she might have paid her premium by mail, as was her custom, or that she might have secured other insurance.

On the afternoon of December 1, 1971, Duncan asked Huff if he had been able to ascertain whether Mrs. Carty had paid her premium and was told he had not. Duncan then inquired as to the amount of the renewal premium and was told by Huff that under an optional payment plan the installment payable at that time would be $55. Duncan then gave Huff his signed check which was made payable to Farmers in the amount of $55. Duncan stated to Huff that "this way we know she has insurance."[1] Huff, on a printed form supplied by Farmers, made out an insurance receipt dated December 1, 1971, at 3:00 p. m. which acknowledge receipt from "Loren Duncan for Norma J. Carty" of the sum of $55 as the first payment on the renewal premium of the policy in question. Since the grace period still had some time to run, Huff and Duncan agreed that Huff would hold the check rather than mailing it in that afternoon.

After Duncan received the receipt, he immediately took it, without the knowledge of Huff, to a Mr. Jack Justice in Branson for delivery to Mrs. Carty. Mr. Justice was the father-in-law of a daughter of Mrs. Carty. Later that evening (about 6:00 p. m.) his son and daughter-in-law arrived at his house and he gave the receipt to them. They returned to Kansas City early the next day (December 2) and delivered the receipt to Mrs. Carty at the hospital. She then wrote out her check to Duncan for $55 and gave it to her daughter to mail to him along with a thank-you note.

[1]. Duncan had not been in touch with Mrs. Carty and did not make the payment at her direction or with her authority. As a matter of fact, Duncan was not acquainted with Mrs. Carty but knew of her only by reason of friendship of his stepdaughter and a daughter of Mrs. Carty.

Huff testified that the understanding with Duncan was that "if the premium had been paid or if she had taken out other insurance that I would give him his check back and he would give me the receipt back." Duncan, on the other hand, testified that prior to the time he gave his check to Huff and received the receipt therefor, he and Huff had no discussion as to whether Mrs. Carty might have purchased insurance from another company and that it was two or three days later when they first discussed that possibility. He testified that Huff told him only that he would get his check back if Mrs. Carty had paid Farmers. However, on cross-examination, Duncan testified that when he talked to Mr. Jack Justice at the time he delivered the receipt to him on the afternoon of December 1, 1971, he told Justice that he and Mr. Huff had had a discussion about whether Mrs. Carty might have obtained other insurance. He also conceded that in his earlier deposition he had testified that his purpose in making the payment was to make sure that Mrs. Carty had some kind of insurance coverage for the accident.

On December 2, 1971, at about 2:30 p. m., Huff told Duncan that he still had not been able to obtain information about Mrs. Carty's insurance. At that time Huff had not mailed in Duncan's check to the company. Duncan then said to Huff that he should go ahead and send in the check so it would get to the home office in time. Huff testified that he then stated to Duncan, "Due to the fact that I have the check and you have the receipt which is dated before the grace period has run out, it is valid as far as that is concerned." To which Duncan replied, "Well, in that case, why don't you go ahead and send the check in with a note explaining if the premium has been paid by Mrs. Carty already for them to send my check back."

At about 6:00 p. m. on that same afternoon, Huff received a telephone call from a Farmers representative who told him that Mrs. Carty had obtained other automobile insurance and that Huff should retrieve the receipt he had given. Huff immediately called Duncan and after advising what he had learned, asked for return of the receipt and offered to return Duncan's check. Duncan replied that he had delivered the receipt to Mrs. Carty and could not return it. This was Huff's first knowledge that Duncan had not retained possession of the receipt.

On December 3, 1971, and again on December 7, 1971, a representative of Farmers tendered Duncan's check to him but he refused in each instance to accept it. On December 7, the check was left by the Farmers representative on Duncan's desk.

The trial court found that "[O]n days prior to December 1, 1971, and after November 29, 1971, as well as on December 1, Mr. Huff and Mr. Duncan had discussed the fact that Mrs. Carty might have paid the premium by mail, as was her custom, or might have secured other insurance." The court went on to find that "[I]n any event, Mr. Duncan decided to pay Mrs. Carty's premium to insure that she had coverage concerning the collision in which she was involved." The court then held that Duncan's acceptance of Farmers' offer to renew during the grace period was conditional and was not to be effective if Mrs. Carty had secured other insurance coverage. Since the evidence disclosed that she had obtained a policy from Farm Bureau, the court held that the Farmers policy was not renewed, was not in force at the time of the accident and Farmers was not obligated to defend or pay any judgments rendered against Mrs. Carty.

In seeking reversal of the trial court's judgment, Mrs. Carty and Farm Bureau (appellants) assert that the trial court erred in finding that Duncan's acceptance of Farmers' offer to renew the Carty policy within the grace period of fifteen days was conditioned on Mrs. Carty not having other insurance because there was no evidence to support such a finding. Before considering that question, we must

first rule upon appellants' contention that the trial court erred in admitting and considering parol evidence that delivery of the check (and receipt) was to be effective only on certain conditions. The basis of appellants' objection to that testimony was that the receipt showing payment of a renewal premium contained no conditions. It unqualifiedly evidenced renewal of the policy. Consequently, say appellants, the oral evidence received undertook to change the contract on the basis of a condition subsequently ascertained, thereby violating the rule against contradicting or altering the terms of a written contract by parol evidence.

The oral evidence received was not offered for the purpose of contradicting or altering the terms of the Farmers policy or the written receipt whereby that policy was to be renewed. It was not offered to alter or contradict the terms of a contract then in effect. It was for the purpose of establishing a condition precedent, not a condition subsequent. The parties wanted to be certain that Mrs. Carty was not ruined by an uninsured accident, and to accomplish that end, they exchanged the check and receipt conditionally at a time when they had been unable to ascertain all the facts. The parol evidence was to show that they agreed at the time the check and receipt were exchanged that they were not to be effective until it was established whether Mrs. Carty had already paid the premium or, in the alternative, had obtained other insurance which was in force at the time of the accident. If it was determined that the premium had been paid or that Mrs. Carty had obtained other insurance, then the check and receipt were to be returned and the policy would not be renewed. If neither of those things had occurred, then the renewal was to be effective.

Oral evidence of an agreement as to when and if a written instrument is to become effective is admissible under a well established exception to the parol evidence rule. 30 Am.Jur.2d Evidence § 1038 states the rule thus:

"It is now the general rule that parol evidence is admissible to show conditions precedent which relate to the delivery or the taking effect of a written instrument. Such evidence does not constitute an oral contradiction or variation of the written instrument, but goes to the very existence of the contract and tends to show that no valid and effective contract ever existed, at least not until the fulfilment of the condition."

In 32A C.J.S. Evidence § 935, the rule is stated as follows:

"Hence, parol evidence is admissible to show conditions precedent, which relate to the delivery or taking effect of the instrument, as that it shall become effective only on certain conditions or contingencies, for this is not an oral contradiction or variation of the written instrument but goes to the very existence of the contract and tends to show that no valid and effective contract ever existed; but such evidence is not admissible to show conditions subsequent, which provide for the nullification or modification of an existing contract, as that the contract is to cease to be effective or is to have an effect different from that stated therein, on certain conditions or contingencies, for this does vary or contradict the terms of the writing."

Missouri cases are consistent with the rule stated in the preceding quotations. For example, Kelley v. Illinois Central R. R., 352 Mo. 301, 177 S.W.2d 435 (1943), cert. denied, 322 U.S. 738, 64 S.Ct. 1055, 88 L.Ed. 1572 (1944), involved an action for personal injuries under the F.E.L.A. The railroad pleaded as a defense that plaintiff had signed a release for his injuries. Plaintiff was permitted to testify that defendant's claim agent obtained his signature on an unconditional release by saying that if plaintiff's attorney then failed to approve the release, it would not be effective. The evidence disclosed that the at-

torney did disapprove. The court held the oral evidence was admissible, saying (177 S.W.2d at 440):

" * * * But, according to the reasoning in the cases relied upon by plaintiff, the condition upon which plaintiff signed was not something that merged in a *completed* contract, but operated to postpone the *effectiveness* of the release until Mr. Wilbourn approved, and since he did not approve, the release never became effective."

In Poplin v. Brown, 200 Mo.App. 255, 205 S.W. 411 (1918), the court held that defendant could prove that a bill of sale was intended to be conditioned upon certain acts of plaintiff which were not done as promised. The court held that the parol evidence rule did not bar the showing of conditions that must be complied with in order to make the contract effective.

In Vardeman v. Bruns, 199 S.W. 710 (Mo.App.1917), the court held parol evidence that a written contract was conditioned on plaintiff obtaining similar contracts from defendant's competitors was admissible as showing a condition precedent to the contract. See also Barrett v. Davis, 104 Mo. 549, 16 S.W. 377 (1891).

The parol evidence as to the conditional nature of the payment and the receipt given therefor, to which appellants object, was not something which was merged in a completed contract of insurance evidenced by the policy and the receipt for the renewal premium. It related instead to a condition precedent which operated to postpone the effectiveness of the receipt (and the renewed policy of insurance) until it was determined that the condition precedent was fulfilled. Accordingly, we hold that parol evidence that the check and receipt were to be returned and were not to be effective if Mrs. Carty had already paid the premium or if she had obtained other insurance was admissible under the previously mentioned exception to the parol evidence rule.

Having so decided, we proceed to determine whether the evidence was sufficient to support the trial court's finding that Duncan's acceptance of Farmers' offer to renew the Carty policy within the grace period was conditioned upon Mrs. Carty not having obtained other insurance. On that subject, as previously noted, Huff testified that he and Duncan had discussed the question of whether Mrs. Carty might have paid her premium by mail or might have obtained other insurance before Duncan gave Huff a check to cover the premium. He stated that their understanding was that if it was ascertained that the premium had been paid by Mrs. Carty or that she had obtained other insurance, Duncan's check and the receipt given therefor were to be returned. Duncan testified on direct examination that he and Huff, prior to the time Duncan delivered his check and received the receipt, talked only of the possibility that Mrs. Carty might have already paid the premium by mail and that they had no discussion then (or previously) about the possibility of her having obtained other insurance. However, on cross-examination, he admitted that when he delivered the receipt to Jack Justice on the afternoon of December 1, 1971 (immediately after he received the receipt at 3:00 p. m. on that date) he told Justice about his dealings with Huff and remarked that "we don't know whether she had insurance elsewhere." That statement would indicate that Duncan and Huff had discussed the question and that necessarily they did so before or at the latest at the time that afternoon when he gave his check to Huff. This, of course, was consistent with the testimony of Huff and inconsistent with Duncan's direct examination testimony. The transcript also discloses that Duncan admitted that in his deposition given earlier he had testified that his purpose in making the payment to Duncan was that he "wanted to be sure that Mrs. Carty did have some kind of insurance coverage because of the accident" and that in talking to Huff he suggested that since they did

not then know Mrs. Carty's condition, Farmers ought to make an effort to find out if she had taken out other insurance or if her condition was such that she was unable to make the premium payment to Farmers. This conversation was before Duncan delivered his check to Huff and also is consistent with the testimony of Huff and inconsistent with Duncan's direct examination testimony at the trial.

Obviously, the trial court believed the testimony of Huff and disbelieved Duncan's direct examination testimony with reference to the time of their discussion about the possibility of other insurance having been obtained. It is clear that the court also believed Huff and disbelieved Duncan on the question of whether their understanding was that the check and receipt were to be returned if Mrs. Carty did have other insurance. We conclude that there was sufficient testimony to support the court's finding that payment of the premium by Duncan on behalf of Mrs. Carty was conditional and that the check was to be returned to Duncan and the receipt to Huff in the event that Mrs. Carty had obtained other insurance coverage.

■ Appellants next urge that they are entitled to a reversal and to entry of judgment in their favor because the evidence shows that Mrs. Carty, by sending her check for $55 to Duncan and by expressing her thanks for what he had done, ratified the unauthorized act of Duncan in paying the premium on her behalf for the purpose of renewing the policy. Having concluded that the payment by Duncan was conditional and that the fact that Mrs. Carty had obtained other insurance coverage prevented completion of the contract of renewal, it is unnecessary to decide whether what Mrs. Carty did was sufficient to constitute ratification. Even if it was, it merely ratified a contract whereby the acceptance of the offer to renew the insurance was conditioned on Mrs. Carty not having obtained other insurance. Her ratification would not rewrite the agreement

made or eliminate the condition precedent agreed upon by Huff and Duncan.

■ Finally, appellants argue that Farmers should be estopped from asserting that the payment by Duncan and the issuance of the receipt by Huff were conditional because Farmers did not seek to get back from Mrs. Carty the receipt on which she relied and did not notify her not to rely on the plain meaning of the receipt given by Huff.

The requirements necessary to a finding of an estoppel are not here present. In the first place, a representation by Farmers to Mrs. Carty has not been shown. Duncan was not a designated or authorized representative of Mrs. Carty. He was a volunteer who, without any knowledge on the part of Mrs. Carty, undertook to prevent a situation in which she had no insurance coverage to protect her with reference to the accident involving the Johnson family.

Secondly, the acts of Farmers were not such as to call for application of the principles of estoppel. The agreement between Huff and Duncan, as found by the trial court and affirmed by us, was that a check for the premium and the receipt given therefor were exchanged conditionally, to be effective only if Mrs. Carty had not already paid the premium or obtained other insurance. Huff, with Duncan's concurrence, did not mail in the check when it was received and did not expect to understand that Duncan would deliver the receipt at that time. In fact, he did not know that it had been delivered by Duncan until he called Duncan the evening of December 2, 1971, and requested return of the receipt. Furthermore, Duncan knew the conditional basis on which the receipt had been given. His testimony shows that he passed on to Jack Justice information that at least so implied. If Mrs. Carty had incomplete information as to the basis on which the receipt had been given and was misled in any respect, it was due to failure of Duncan and Justice to adequately inform her, not to acts of Farmers' agents.

Finally, the evidence does not show that Mrs. Carty relied on the receipt to her detriment. She had not intended to renew the Farmers policy and had understood it would lapse for nonpayment of the premium. When she received the receipt via Duncan, Justice and her daughter and son-in-law, she did not conclude that she now had coverage under the Farmers policy. She immediately mailed her check for $55 to Duncan but her testimony indicates that was motivated by a desire to reimburse Duncan. In her testimony she was aksed whether, after she received the receipt, she notified Farmers of the occurrence of the accident (she had notified Farm Bureau). She responded by saying that she had not because she "didn't know whether she had insurance with them or not." There was also no proof of any kind that if she had been informed by Farmers of the conditional nature of the delivery of the receipt, she would have proceeded on her own to pay the premium and thereby obtain insurance in addition to the Farm Bureau policy she had obtained as a replacement for the Farmers coverage. Accordingly, we overrule the contention that Farmers is estopped to assert the conditional nature of the delivery of the receipt.

Judgment affirmed.

DONNELLY, C. J., and SEILER, MORGAN, HOLMAN, and HENLEY, JJ., concur.

BARDGETT, J., dissents in separate dissenting opinion filed.

BARDGETT, Judge (dissenting).

I respectfully dissent.

Farmers Insurance Exchange (hereafter Exchange) sent Mrs. Carty the printed expiration note set forth in the principal opinion. There were no conditions set forth in the note for renewal of the policy other than payment of premium within 15 days of November 18, 1971. The option to renew would expire at midnight December 3, 1971. Mrs. Carty had the right to decide on November 18 that she would not renew the policy and thereafter change her mind and renew it. Her right to do so did not depend upon whether she had an automobile accident in the meantime.

If, instead of sending the premium payment on December 2, 1971, to Duncan to reimburse him for paying the premium for her, she had sent it to Exchange on December 2, 1971, there would appear to be no question but what the policy had been renewed and coverage afforded for the accident of November 24, 1971.

But to send the check to Exchange would merely have been to provide Exchange with a double premium. So, Mrs. Carty did the sensible thing and reimbursed Duncan in the amount he had advanced to pay the premium and there is no question as to whether or not the renewal premium had been paid within the grace period. It had been paid.

Mrs. Carty was the insured party to this contract, not Mr. Duncan. Her approval and ratification of Mr. Duncan's payment of premium for her was not conditioned at all. Furthermore, it would appear from the renewal notice she received from Exchange that she had no right to make a conditional payment of the premium or conditionally accept the renewal offer.

The opinion of the Missouri Court of Appeals, Springfield District, reversed and remanded this case with directions to enter judgment holding that coverage was afforded by the Exchange policy, saying:

" '[W]hen one acting as agent, although without previous authority, makes a contract for the benefit of another, the latter may at any time afterwards, while the contract is in force, adopt and ratify the act, and thus entitle himself to all its benefits, as fully as if he had given express authority to make the contract. A contract of insurance is no exception to this general rule; . . . .' Ferguson v. Pekin Plow Co., 141 Mo. 161, 172, 42 S.W. 711, 713 (1897). The overall holding that ratifica-

tion may be shown from any acts or conduct by the principal which reasonably shows an intention to ratify unauthorized acts done on his behalf, is especially applicable where the principal makes payment on account of benefits received as a result of the act of the agent. 2A C.J.S. Agency, § 88, pp. 692–693. This is true whether the principal reimburses the agent for moneys expended on his behalf (Buck v. Houghtaling, 110 App.Div. 52, 96 N.Y.S. 1034, 1036–1037[1] (1905)) or whether the principal makes payment directly to the third party. Clark v. Gneiting, 95 Idaho 10, 501 P.2d 278, 280–281[8] (1972).

"It is not necessary to a valid and effecitve ratification that it be communicated to the other party (Restatement, Second, Agency § 95; 2A C.J.S. Agency § 79, at p. 675), and ratification becomes self-evident and fixed 'if the purported principal, with knowledge of the facts, in an action in which the third person ·. . . is an adverse party: (a) brings suit to enforce promises which were part of the unauthorized transaction or to secure interests which were the fruit of such transaction and to which he would be entitled only if the act had been authorized; or (b) bases a defense upon the unauthorized transaction as though it were authorized; or (c) continues to maintain such suit or base such defense.' Restatement, Second, Agency § 97; Restatement, Agency § 97."

As to the question of whether parol evidence was admissible to show the conditional payment of premium by Mr. Duncan for Mrs. Carty, the court of appeals opinion held the parol evidence to be inadmissible, saying:

"Actually the parol evidence rule is one of substantive law, not one of evidence, so that parol evidence cannot alter a written contract or establish another or varied one in its stead even though the evidence be injected without objection. Melton v. Ensley, 421 S.W.2d 44, 51[6, 7] (Mo.App. 1967), and authorities cited therein note 3. Insurance contracts come within the parol evidence rule (Prestigiacamo v. American

Equitable Assur. Co., 240 Mo.App. 839, 846–847, 221 S.W.2d 217, 221[2] (1949); 32A C.J.S. Evidence § 908, p. 275 et seq.), and the rule is particularly applicable to liability insurance policies. Hartford Accident & Indem. Co. v. Farmington Auction, 356 S.W.2d 512, 520[10] (Mo.App.1962).

"In an effort to support the holding below, Exchange relies on the proposition that the parol evidence rule does not apply to 'mere receipts' which may be contradicted by showing that the money receipted for was not, in fact, paid. 32A·C.J.S. Evidence § 926, at p. 302. But this ignores the equally long recognized rule that '[A]lthough the writing may take the form of a receipt, it may also have the elements of a contract, and in so far as it expresses the contract or is contractual in its nature, it is a contract between the parties and is subject to the same rules as other contracts in regard to being explained or added to or contradicted by parol evidence. The paper may acknowledge the receipt of money and may at the same time be a contract or an agreement because of its terms.' Eggimann v. Houck, 240 S.W. 478, 480[2] (Mo.App.1922).

" 'Insured's Receipt' prepared, signed and delivered by the agent for Exchange, was more than a simple acknowledgment of having received from 'Loren Duncan for Norma J. Carty' a check for $55; it also evidenced a 'Renewal' of the insurance policy. Huff's testimony did not contradict the receipt of the check, for this is not denied. Instead, his testimony was designed to show that the consideration which was admittedly delivered was given for an agreement different from what the writing said. This was not proper. State ex rel. and to Use of Alport v. Boyle-Pryor Const. Co., 352 Mo. 1061, 1068–1069, 180 S.W.2d 727, 730[3, 4] (1944).

"A writing is to be judged by its subject matter, not by the name bestowed (Hamm v. Hamm, 437 S.W.2d 449, 452 (Mo.App. 1969)), and the denomination of the instrument in question as an 'Insured's Receipt' by Exchange, did not transform it, per se,

into a 'mere receipt.' When the statement as to consideration 'is more than one of mere recital or acknowledgment and is essentially of a contractual or executory nature, it can no more be changed or contradicted by parol or extrinsic evidence than any other part of the written instrument.' Hardin v. Ray, 404 S.W.2d 764, 771[12] (Mo.App.1966). A renewal receipt is more than a mere receipt for money; it is written evidence of a contract and may not be adulterated by parol evidence. Craig v. National Farmers Union Automobile & Cas. Co., 76 S.D. 349, 78 N.W.2d 464, 467[6] (1956); Lewis v. Western Assur. Co., 175 Tenn. 37, 130 S.W.2d 982, 983 (1939); 44 C.J.S. Insurance § 287, p. 1136."

I believe the opinion of the court of appeals was correct in its analysis of the issues and its decision holding that the Exchange policy was in effect, and therefore I dissent.